**CLEAR LAKE CITY WATER AU-THORITY, Appellant/Cross-Appellee,**

**v.**

**KIRBY LAKE DEVELOPMENT, LTD., Miter Development Company, LLC, Taylor Lake, Ltd., and University Development, Inc., Appellees/Cross-Appellants.**

No. 14–01–00976–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Dec. 9, 2003.

Barry Abrams, Houston, for appellants.

Ramon G. Viada, III, Houston, for appellees.

Panel consists of Justice LESLIE BROCK YATES and Justice HUDSON.

## OPINION

LESLIE BROCK YATES, Justice.

Appellant Clear Lake City Water Authority ("the Authority") appeals a judgment awarding actual damages for breach of four contracts totaling $1,696,171, attorney's fees, pre-and post-judgment interest, and costs in favor of appellees. The judgment also declared that the Authority was obligated, under its contracts with appellees, to purchase appellees' sewer, water, and drainage facilities. Additionally, the Authority board of directors was ordered to levy, assess, and collect taxes or assessments to pay the judgment. For the reasons stated below, we reverse and render the claims of three of the plaintiffs, and reverse and remand the claims of the remaining plaintiff.

## FACTUAL BACKGROUND

The Authority is a conservation and reclamation district created by the Texas Legislature in 1963 to provide water, sewer, and drainage facilities to the Clear

Lake area. Between 1993 and 1998, the Authority entered into contracts with appellees Kirby Lake Development, Ltd. ("Kirby Lake"), Miter Development Company, LLC ("Miter"), Taylor Lake Ltd. ("Taylor Lake"), and University Development, Inc. ("University"), to pay a portion of the costs incurred in constructing water and sewer facilities on properties appellees developed within the Authority.[1] Under each contract, entitled "Sales Agreement and Lease of Facilities," the developer agreed to lease the facilities to the Authority at no charge until the Authority purchased them, and the Authority agreed to reimburse the developer 70% of the costs of constructing the facilities. All of the contracts except University's contract contained substantially the same payment language.

The contracts contemplated that the primary source of funds for developer reimbursements would be the proceeds from bond sales. In 1989, the voters within the Authority had authorized the sale of $43.6 million in bonds for the purpose of reimbursing developers and paying for the installation and upkeep of the Authority's water, sewer, and drainage system. The Authority subsequently reimbursed University for the facilities constructed in two of the four sections in its development with the proceeds of one of the bond sales. By 1997, however, all of the bonds authorized in 1989 had been sold, so the Authority decided to call another bond election to obtain voter approval for the sale of additional bonds to be used for system needs and to pay for reimbursements to developers, including University and the other appellees.

On March 12, 1998, the Authority voted to call a bond election for May 2, 1998. It also voted to submit its bond proposals in three different propositions. Proposition 1 requested voter authorization for bonds for system needs and current developer reimbursements, including reimbursements to appellees. Propositions 2 and 3 were for future developer reimbursements. The Authority also approved DEV–90, which put into written policy the practice of requiring developers to pay 100% of the construction costs for facilities in their developments up front, and reimbursing them 70% of the costs from voter-approved bond funds.

Gayle Yoder, then a member of the board of directors of the Authority and later its President, became concerned that voters should be given a choice about authorizing bonds for developer reimbursements. She favored separating the bond propositions to distinguish between what she termed the "necessities" of keeping the system running and developer "subsidies." She objected to the inclusion of developer reimbursements in Proposition 1, and publicly took a position against the bond election as structured. Her opinion became the subject of local newspaper articles, and at one point, she distributed a memorandum detailing her opposition in her neighborhood of Taylor Lake Village. The memorandum reflected that it was from "Gayle I. Yoder, Director, Clear Lake City Water Authority."

The May 2 election also included several directors' positions. Two incumbent directors were challenged by Don Johnson and Elliott Cooper, who both ran on an anti-bond platform. They prepared "Vote No Bond$" campaign signs, some of which

---

1. Kirby Lake, Miter and University each entered into one contract with the Authority. Taylor Lake entered into two contracts with the Authority, one in 1994 and one in 1998, because the Authority was not immediately able to annex a portion of the property Taylor Lake sought to develop.

Yoder distributed. The signs also stated "Stop using taxes to subsidize developers" and "CLC Water Authority."[2] Johnson posted a number of signs around the Authority's building.

All the propositions submitted to the voters in the May 2 election failed, and Johnson and Cooper defeated the incumbent directors. Of the three voting precincts in the Authority, the precinct that included Yoder's neighborhood of Taylor Lake Village (where she had distributed her memo to residents) defeated the bonds by the widest margin.

Because Proposition 1 failed and the Authority still required funds for maintenance and expansion of its system, the Authority decided to hold another bond election in October 1998. This time, system needs were separated from developer reimbursements into two propositions. As before, the "Vote No Bond$" signs reappeared around the Authority building and elsewhere, this time prompting a letter from the Authority's counsel requesting they be taken down because they could be read to imply that the Authority was taking a position against the bonds.

Ultimately, Proposition 1, requesting bonds for system needs, passed. However, Proposition 2, requesting bonds for funds to reimburse developers—including appellees—failed. One month later, in November 1998, the Authority changed its DEV–90 policy on reimbursing developers to require developers to pay 100% of the cost of water, sewer, and drainage facilities they install in new subdivisions.

When appellees were not paid for the facilities, they brought suit against the Authority alleging breach of contract, quan-

tum meruit, and an unconstitutional taking based on the Authority's use of the facilities to provide water, sewer, and drainage services to customers in appellees' developments. Appellees also sought a writ of mandamus and a declaratory judgment that the Authority was obligated to fulfill its obligation to purchase the facilities "as soon as possible" with funds on hand or with the issuance of revenue bonds, which would not require voter approval. Appellees pleaded for attorney's fees and costs based on sections 37.009 and 38.001 of the Texas Civil Practice and Remedies Code, and requested a jury trial.

At trial, during questioning from appellees' attorney, Yoder took the position that the revised DEV–90 policy requiring developers to pay 100% of the cost of constructing water, sewer, and drainage facilities within their developments applied to appellees, even though it was not in effect when they signed their contracts, and appellees' agreements call for the Authority to pay 70% of the costs. However, she also stated that the full board had not voted on whether to apply the new policy to appellees. Don Johnson, when asked whether he was opposed to spending any money the Authority has on hand to reimburse appellees, stated that the Authority "has evolved beyond the point of paying any kind of developer subsidies. I think we are past that." Johnson also testified that he thought the Authority could just continue the lease arrangement indefinitely, so it would not have to pay for the facilities and taxpayers would not be charged.

The jury found breach of contract and awarded Kirby Lake $748,675.00, Miter $74,252.00, Taylor Lake $510,000.00, and University $363,244.00.[3] The jury also

---

2. Apparently, the signs also included a date that was taped over for use in the later bond election held in October 1998.

3. The jury found that the Authority failed to comply with each of the contracts except the 1998 Taylor Lake contract, and did not award

found that appellees were entitled to recover in quantum meruit and awarded the same amount of damages. The issue of attorney's fees was tried to the court. Appellees elected to recover for breach of contract, and the trial court entered judgment for $1,696,171.00 in actual damages, $442,398.56 in prejudgment interest, and $362,014.75 in attorney's fees, plus post-judgment interest and costs. The trial court also declared that the Authority was obligated to purchase the facilities and ordered it to take any and all actions required to purchase them. The trial court further ordered the Authority, pursuant to Texas Water Code section 49.066(b), to levy, assess, and collect taxes or assessments to pay the judgment. The court denied the Authority's post-verdict motions, including a motion for directed verdict and judgment notwithstanding the verdict. This appeal followed.

## ISSUES ON APPEAL

On appeal, the Authority raises seventeen issues (not including subparts) that can be grouped in the following broad categories: (1) contract construction; (2) charge error; (3) attorney fees; (4) pre- and post-judgment interest; and (5) quantum meruit. By cross-appeal, the appellees contend the trial court erred in granting a directed verdict on their takings claim. Our disposition of the Authority's contract construction and charge error issues make it unnecessary for us to address its remaining issues. We will then take up the appellees' alternative grounds for recovery based on their quantum meruit claim and the trial court's declaratory judgment. Lastly, we will address appellees' cross-point that the trial court erred

in granting a directed verdict on their takings claim.

## I. The Authority's Issues

### A. The Construction of the Contracts

The Authority contends the payment provisions of the contracts were unambiguous and the Authority did not breach those provisions. In response, appellees do not directly address whether the contracts were ambiguous. Instead, they take aim at specific contract language and assert that, as they construe the language, the Authority breached the contracts in several ways. Because the parties' arguments regarding the contract language and the facts are often at cross-purposes, we will incorporate into our discussion as much of the parties' arguments as required to resolve the issues raised.

### 1. Were the Contracts Unambiguous?

The trial court determined the contracts were ambiguous and instructed the jury to interpret them. However, the trial court did not include special issues asking the jury to interpret specific provisions, so we do not know how the jury interpreted the contracts or on what basis they found breach of contract. The Authority contends the payment provisions of the contracts unambiguously provide that the developers were to be paid only out of legally available and allocated voter-approved bond funds, and while the Authority could use funds from other sources to pay the developers, it was not obligated to do so. In contrast, appellees contend the Authority agreed to pay "as soon as possible" from any available source, including revenue bonds, which do not require voter approval.[4] The payment provisions of all

---

damages for that contract. Taylor Lake does not appeal this finding.

4. In addition to revenue bonds, appellees contend that the Authority could pay with surplus funds from the sale of ad valorem tax bonds or cash on hand.

the contracts at issue are similarly worded, with the exception of the University contract, which is discussed separately.

We hold that the Authority is correct with regard to three of the four contracts at issue: the Kirby Lake, Miter, and 1994 Taylor Lake contracts. Accordingly, we reverse and render judgment in favor of the Authority as to those contracts. With regard to the University contract, we find that it is ambiguous. However, as discussed in section I.B. below, charge error requires that University's claims be remanded for new trial.

### (a) *The applicable law*

The primary concern of a court in construing a written contract is to ascertain the true intent of the parties as expressed in the instrument. *Lenape Res. Corp. v. Tennessee Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996); *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). To achieve this objective, we examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Coker,* 650 S.W.2d at 393. We construe a contract from a utilitarian standpoint, bearing in mind the particular business activity sought to be served. *Lenape Res.,* 925 S.W.2d at 574.

If a written contract is so worded that it can be given a definite or certain legal meaning, then it is not ambiguous and it can be construed as a matter of law. *Wal–Mart Stores, Inc. v. Sturges,* 52 S.W.3d 711, 728 (Tex.2001); *Lenape Res.,* 925 S.W.2d at 574. Parol evidence is not admissible for the purpose of creating an ambiguity. *Nat'l Union Fire Ins. Co. of Pittsburgh, Pennsylvania, v. CBI Indus., Inc.,* 907 S.W.2d 517, 520 (Tex.1995). However, if the language of a contract is subject to two or more reasonable interpretations, it is ambiguous. *Id.; see also Lenape Res.,* 925 S.W.2d at 574.

Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present at the time the contract was executed. *Nat'l Union Fire Ins. Co.,* 907 S.W.2d at 520; *see also Coker,* 650 S.W.2d at 394. Only when a contract is first determined to be ambiguous may the courts consider the parties' interpretation and admit extraneous evidence to determine the true meaning of the instrument. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996).

An ambiguity does not arise simply because the parties advance conflicting interpretations of the contract. *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex.1994); *Sun Oil Co. (Delaware) v. Madeley,* 626 S.W.2d 726, 727 (Tex.1981). For an ambiguity to exist, both interpretations must be reasonable. *Nat'l Union Fire Ins. Co.,* 907 S.W.2d at 520; *see also Glover v. Nat'l Ins. Underwriters,* 545 S.W.2d 755, 761 (Tex.1977). Thus, the appellate court must decide whether there is more than one reasonable interpretation of the contract such that a fact issue was created concerning the parties' intent. *Columbia Gas Transmission,* 940 S.W.2d at 589.

### (b) *The Kirby Lake, Miter, and 1994 Taylor Lake contracts*

The first two "whereas clauses" of the Kirby Lake, Miter, and 1994 Taylor Lake contracts are identical:

> WHEREAS, the Authority is authorized to provide, among other things, water supply, waste disposal and drainage facilities to the land within its boundaries;

> WHEREAS, the Developer is developing land within the Authority and de-

sires that water supply, waste disposal, and drainage facilities be provided to such land prior to the time at which the Authority can obtain voter approval and pay for the construction or acquisition of such facilities with the proceeds of its bonds;. . . .

The three contracts also contain substantially the same payment provision:

> **PURCHASE AND ASSIGNMENT.** Subject to other terms and provisions hereof, the Developer agrees to sell and the Authority agrees to purchase all completed portions of the Facilities ... as soon as possible, but not more than 30 days after receipt of bond proceeds legally available and allocated by the Authority for payment therefore, in consideration of the purchase price defined in the following Section. *It is expressly acknowledged and agreed by the parties hereto, that the Authority has no existing voter authorization to issue any bonds to pay for the cost of the Facilities, and does not anticipate that funds will be available for such costs without a voter approved bond sale for such purchase. The Authority intends to call a bond election in the near future, but is not obligated to do so, and the Authority cannot predict when, if ever, such an election and bond sale will occur, or when, if ever, the Authority will have other funds available and allocated for the purchase of the Facilities. The Authority shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so. The Authority does agree, however, that it shall include in any bond election it does hold subsequent to the effective date of this Agreement bond authorization in an amount sufficient to pay the purchase price of the Facilities. The Authority further agrees that it shall include purchase of the Facilities in any bond issue sold subsequent to any such election.*[5]

 We have carefully reviewed the contracts in their entirety, and conclude that the language of the above provisions, as well as the remainder of the contracts, demonstrate that these contracts unambiguously require the Authority to reimburse appellees only with voter-approved bond funds that are legally available and allocated for that purpose. While the Authority obligated itself to purchase the completed facilities "as soon as possible," that requirement did not arise until after the Authority received the proceeds of voter-approved bond funds. That the bond funds were to be voter-approved bond funds, as opposed to other types of bonds or funds, is also evident in the payment provision: "It is expressly acknowledged and agreed by the parties hereto, that the Authority has no existing voter authorization to issue any bonds to pay for the cost of the Facilities, and does not anticipate that funds will be available for such costs without a voter approved bond sale for such purchase." This statement, in the context of the entire provision, and in conjunction with other sections of the contracts, unequivocally indicates that the only funds the Authority was required to use to purchase the facilities was voter-approved bond funds. This conclusion is confirmed by the explicit language that the Authority could, but was not obligated to, use other sources of payment: "The Au-

5. The bold and italicized portions are reproduced as they appear in the Kirby Lake and Miter contracts. The provision in the 1994 Taylor Lake contract consists of uniform characters without emphasis. The 1994 Taylor Lake contract also specifies that "The Authority intends to call a bond election in March or May of 1994" instead of "in the near future."

thority shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so." Additionally, there is no obligation on the Authority to ensure that a bond election occurs, or that the voters give their approval: "The Authority cannot predict when, if ever, such an election and bond sale will occur, or when, if ever, the Authority will have other funds available and allocated for the purchase of the Facilities."

 Appellees argue that the payment provision constitutes the Authority's promise to pay for the facilities, and voter approval to sell bonds is not a condition precedent that excuses the Authority's obligation to pay. A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex.1976). Conditions precedent to an obligation to perform are those acts or events, which occur subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual duty. *Id.* However, when the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, then the agreement will be interpreted as creating a covenant rather than a condition. *Id.* Because of their harshness in operation, conditions are not favorites of the law. *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex.1990). Thus, in construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. *Id.*

We reject appellees' contention that the receipt of voter-approved bond funds is not a condition precedent, because the payment provision of the contracts unambiguously provides that the Authority's obligation to pay is expressly conditioned upon the receipt of voter-approved bond funds. *See McWilliams v. Gilbert*, 715 S.W.2d 761, 763–64 (Tex.App.-Houston [1st Dist.] 1986, no writ) (holding that indemnity agreement unambiguously restricted general partners' reimbursement from partner to designated specific source); *see also City of Seymour v. Municipal Acceptance Corp.*, 96 S.W.2d 814, 816–17 (Tex.Civ. App.-Dallas 1936, writ dism'd by agreement) (holding that contract with city limiting source of payment to net revenues of light plant created a condition precedent to city's liability). To construe the payment provisions another way would be contrary to the plain language of the contracts.

Moreover, the failure of the condition precedent at a given time does not result in a forfeiture, only a delay in payment. Nowhere in the contracts does it provide that the failure to obtain voter approval forfeits appellees' right to receive payment for their facilities. The Authority is not excused from performing its obligation to pay when voters do not, in a particular election, approve the sale of bond funds to pay appellees; its obligation to pay simply does not arise at that time. That it may have appeared highly unlikely, at the time appellees entered to these contracts, that voters would not approve a bond sale is no reason to rewrite the plain language of the contracts. This conclusion is further supported by the fact that, under the contracts, the Authority was permitted to lease the facilities until such time as it purchased them—a provision that demonstrates the parties contemplated a continuing contractual relationship of an unspecified duration.[6]

6. The Authority, in addition to arguing that the receipt of voter-approved bond funds is a

Appellees contend that even if the receipt of voter-approved bond funds is a condition precedent to payment, the Authority's actions amount to a repudiation of the contracts. Specifically, appellees argue that (1) the trial testimony of Yoder and Johnson amounts to a judicial admission that the Authority has no intention of complying with the contracts, (2) voters authorized bonds to be sold to reimburse University and Kirby Lake, and (3) the Authority had over $5 million in surplus funds from voter-approved bond sales it could have used to pay appellees for their facilities. First, while the statements of Yoder and Johnson may reflect their individual beliefs, appellees cite no authority to support their contention that these statements may be attributed to the Authority, and the jury was charged that action by the Authority requires a vote of at least a quorum of the directors in a public meeting in compliance with the Open Meetings Act. Second, the record shows that the voters approved the sale of bonds for improvements within the Authority's boundaries, not specifically to University and Kirby Lake, as appellees contend. Third, as we have held, while the Authority could use other funds to pay for appellees' facilities, it was not obligated to do so with any funds other than those from a voter-approved bond sale for that purpose; there was no obligation that the Authority use funds from previous bond sales.

### (c) *Appellees' evidence of breach*

Appellees place great emphasis on the following provision in the contracts, which

appellees call the "due diligence" requirement:

**ISSUANCE OF BONDS:** The Authority shall have no obligation to obtain approval from the voters of bonds to finance purchase of the Facilities, but if such voter approval is obtained, the Authority shall sell Authority bonds for the purpose of purchasing the Facilities. The Authority agrees to commence to obtain approval by the [Texas Natural Resource Conservation] Commission of the bonds to finance purchase of the facilities upon the successful passage of a bond election subsequent to the effective date of this Agreement, but subject to the right of the Authority to reasonably and efficiently integrate any and all other eligible Authority projects in such sale. The Authority agrees to proceed with due diligence to consummate the issuance of such bonds and the acquisition of the Facilities under such circumstances.

According to appellees, the Authority breached its "due diligence" obligation by drawing the public's attention to a misleading distinction between system needs and developer "subsidies," opposing the bond propositions, and separating the propositions for developer reimbursements from the proposition for system needs, which caused the bond elections to fail. Appellees also contend these actions constituted a violation of the Authority's ethical duties. We disagree.

As an initial matter, it is plain that the provision imposes no obligation on the Au-

condition precedent to payment under the contracts, also contended that the language in the payment provision of the contracts that the funds must be "legally available" likewise constituted a condition precedent to payment. Because no funds became "legally available" for payment, the Authority urges, the condition precedent was not fulfilled and there can

be no breach of contract. However, we do not find the phrase "legally available" in the context of the payment provisions to constitute a condition precedent. At most, it simply recognizes the manner and mechanism by which the Authority would authorize the expenditures.

thority to obtain voter approval: "the Authority is not obligated to obtain approval from the voters of bonds to finance the purchase of facilities...." The remainder of the sentence also makes clear that this provision does not apply until such time as voter approval is obtained: "but *if* voter approval is obtained, *then* it shall seek Commission approval of the bonds, and shall proceed with due diligence to consummate the issuance of the bonds and acquisition of the facilities" (emphasis added). The remainder of the paragraph details the Authority's obligations "upon the successful passage of a bond election." We do not interpret this provision to require the Authority to proceed with due diligence to obtain voter approval. Even if the provision could be read as appellees suggest, Yoder's actions, such as distributing memorandums in her neighborhood, publicly opposing the structure of the propositions, and referring to the reimbursements as "subsidies," are not official acts of the Authority. *Webster v. Texas & Pac. Motor Transp. Co.*, 140 Tex. 131, 134–35, 166 S.W.2d 75, 76–77 (1942) (holding that individual members acting separately and not in a public meeting do not bind the board of a governmental entity); *King v. Guerra*, 1 S.W.2d 373, 374 (Tex.Civ.App.-San Antonio 1927, writ ref'd) (same); *see also City of Corpus Christi v. Bayfront Assoc., Ltd.*, 814 S.W.2d 98, 105–06 (Tex. App.-Corpus Christi 1991, writ denied) (inappropriate statements by city council member on city stationery were not bind-

ing on city). Appellees cite no contradictory authority.

Appellees also point to the Authority's "official acts" of issuing official newsletters which, appellees contend, signaled the voters to vote against the propositions, and separating the propositions in the October 1998 elections. However, appellees identify nothing in the newsletters that indicated that the Authority was advising voters to vote against the bond proposition for developer reimbursements. We also find no language in the contracts to support the contention that separating the propositions was a breach of contract. The contracts contain no requirement that the ballot language be structured in any particular way; all that was required was that the developers be included in any subsequent election, and they were.[7]

Appellees similarly argue the "consents and approvals" paragraph that appears in each of the contracts obligated the Authority not to unreasonably withhold its consent or approval to use other available funds to pay appellees. This paragraph, which appears toward the end of the contracts along with other miscellaneous provisions, provides as follows:

**CONSENTS AND APPROVALS.** Whenever the consent or approval of either party hereto, or of any engineer of [sic] agent therefore, shall be required under the provisions hereof, such consent or approval shall not be unreasonably withheld.

We disagree with appellees' interpretation of this provision. The payment provisions contain no language that the Authority is required to "consent" or give its "approval" to make this provision applicable.[8]

---

7. The Authority also argues, as additional support for its contention that it did not breach the contracts by refusing to combine the bond elections, that the October 1998 election was outside the scope of the Kirby Lake, Miter, and Taylor Lake contracts because it was only required to include a proposition for developer reimbursements in one

election. We express no opinion on the Authority's interpretation of the provision, as appellees make no argument in response and neither party raises this interpretation of the provision as an issue.

8. In contrast, other provisions of the contracts expressly incorporate this provision. For example, section 1.01 of the University

Moreover, appellees' interpretation conflicts with the express acknowledgment in the contracts that the Authority "shall have the right to purchase the Facilities with funds available from a source other than a bond sale for such purpose, but shall have no obligation to do so." We cannot agree that this general provision trumps the express language of the payment provisions.

Therefore, we hold that the Kirby Lake, Miter, and Taylor Lake contracts unambiguously require the receipt of legally available and allocated voter-approved bond funds as a condition precedent to reimbursement. We further hold that the actions of Yoder and the other Authority board members in connection with the bond elections, the statements of Yoder and Johnson at trial, and the wording of the bond propositions in May and October of 1998 do not constitute a breach of the contracts as a matter of law.

### (d) *The University contract*

 The University contract, however, is different. Unlike the other contracts, the University contract expressly acknowledges, in the first whereas clause, the 1989 bond election in which the voters approved the issuance of $43.6 million in bonds:[9]

> WHEREAS, the Authority is authorized to provide, among other things, water supply, waste disposal, and drainage facilities to the land within its boundaries and held a bond election on October 14, 1989 at which the voters authorized the issuance of $43.6 million in bonds for those purposes;

The second and third whereas clauses provide as follows:

> WHEREAS, the Authority desires that such facilities be provided prior to the sale of its bonds to pay therefor, because the interim growth of taxable values in the Authority should make such bonds saleable upon better terms and will permit the Authority to meet more easily debt service requirements on such bonds and because timely construction of such facilities will prevent further escalation of construction costs;
>
> WHEREAS, the Authority desires that such facilities be provided prior to the sale of its bonds to pay therefor, because the interim growth of taxable values in the Authority should make such bonds

---

contract, dealing with construction of the facilities, provides "[a]ny and all Contracts or change orders to the Contracts shall be subject to approval by the board of Directors of the Authority (the "Board") (which approval shall not be unreasonably withheld)." Likewise, in section 4.01, dealing with the construction of street improvements, the developer agrees to complete and pay for street improvements in the subdivision "as described in the respective plats thereof (as the same may hereafter be amended either without effect to the size or location of such Street Improvements or with the consent of the Authority) in accordance with the plans and specifications therefor approved by the engineers for the Authority, which approval shall not unreasonably be withheld. . . ."

**9.** Appellees also contend the area that became the subject of the Kirby Lake contract was included in the 1989 bond election, but there is no reference to the bond election in the Kirby Lake contract, which was executed in July of 1997, as there is in the University contract. Moreover, Kirby Lake did not enter into its contract with the Authority until after all the 1989 bond proceeds had been spent or allocated for other purposes. As reflected in the minutes of the public meeting in which the Authority voted to authorize the contract with Kirby Lake, Jack Beard, Kirby Lake's principal, and the Authority stipulated to the following:

> Developer reimbursements are strictly subject to the availability of appropriate bond funds. At this time the Authority and the Developer, Kirby Lake Development, Inc. acknowledge that such funds are not available and that the availability of such funds is subject to voter approval.

saleable upon better terms and will permit the Authority to meet more easily debt service requirements on such bonds and because timely construction of such facilities will prevent further escalation of construction costs;

The University contract also contains additional language not found in the payment provisions of the other contracts, which is indicated by added italics:

**Section 2.01. PURCHASE AND ASSIGNMENT.** Subject to the other terms and provisions hereof, the Developer agrees to sell and the Authority agrees to purchase all completed portions of the Facilities ... as soon as possible, but not more than 30 days after receipt of bond proceeds, *or other funds not required for the payment of operating and maintenance expenses or the payment of debt service on any bonds of the Authority,* legally available and allocated by the Authority for payment therefor, in consideration of the purchase price in the following Section.

This section does not contain the express acknowledgments and "no obligation" language found in the other contracts. Appellees do not address whether the contract is ambiguous, but they interpret this provision to mean that the Authority agreed to purchase the facilities as soon as possible from any available source of funds. We disagree with appellees' interpretation and find that the University contract is ambiguous.

The first whereas clause of the University contract specifically acknowledges that voters authorized the issuance of $43.6 million in bonds for the purpose of the development of water supply, waste disposal, and drainage facilities on land within the

Authority, including the land later purchased by University. In the second and third whereas clauses, the parties acknowledge that the development of the facilities prior to the time the Authority can pay for them with bond proceeds is desired and advantageous to both parties. The bonds referred to in the second and third whereas clauses refer back to the bonds authorized by the voters in the first whereas clause. Therefore, the contract appears to contemplate that University was to be paid with voter-approved bond funds.[10]

Other provisions in the University contract similarly demonstrate that such bond funds were the intended source of payment. In the "Purchase Price" section, the Authority agreed to pay an amount equal to specified costs of the developer, plus interest based on the interest rate "borne by the Authority's bonds issued to reimburse the Developer for these amounts...." In the next section, the Authority agreed to "proceed with due diligence" to obtain the Commission's approval of a bond offering to finance the purchase of University's contemplated facilities. In a separate section, the timing of University's obligation to build street improvements is tied to the Authority's "delivery of its bonds issued to finance the acquisition and construction of the Facilities." Similarly, the developer agrees to provide a letter of credit to cover the cost of street improvements unless the street improvements are completed by the date the Authority advertises "the sale of its bonds issued to finance acquisition and construction of the Facilities."

Moreover, evidence of the circumstances surrounding the execution of the contract support the construction that the facilities

**10.** Sections 1 and 2 of the University development were ultimately included in a 1997 bond sale, and University was paid for those sections out of those proceeds. Sections 3 and 4 were put on the May 1998 ballot, but the proposition failed, and University was not paid for those sections.

were to be paid for with voter-approved bond funds. The minutes of the October 14, 1993 board of directors meeting of the Authority reflects that the board approved University's project "to be funded with bond funds." In a follow-up letter to University's principal, George Kawaja, from the Authority's general manager, Wilbert Molbert, Kawaja was informed that the Authority had agreed to participate in the construction costs for the proposed water, sewer, and drainage facilities for the project "in accordance with the Authority's developmental policies." Kawaja also was informed that the Authority's contribution was to be financed "by a future bond sale if adequate bonding authorization is available (such authorization is presently limited) or would be included in a future bond authorization election that would require voter approval." Kawaja testified that he understood that he was to be paid as described in Molbert's letter.

However, as noted above, the "Purchase and Assignment" section provides that the Authority agrees to pay for the facilities with *either* bond proceeds or "other funds not required for the payment of operating and maintenance expenses or the payment of debt service on any bonds of the Authority." Additionally, in the "Purchase Price" section's provision for the payment of interest, the parties agree to a formula for the calculation of the interest, "*provided, however, that if such purchase price is paid in whole or in part from proceeds of bonds of the Authority, such purchase price or part thereof* shall be subject to the Rules and applicable orders of the Commission, and the Development Policies of the Authority then in effect" (emphasis added). This language further suggests that an alternate, or additional, source of funding was contemplated. Moreover, unlike the other contracts, the University contract does not contain the express language that the Authority may, but is not obligated to, pay for the facilities with funds other than bond funds.

Nevertheless, the extent to which the "other funds" language may apply is unclear. It does not appear to encompass a complete alternative to payment with bond proceeds, because the references to bond funds throughout the contract indicate that such funds were intended to be at least a primary source of funding. Additionally, there is no alternative language for those provisions of the contract that are tied to the issuance or sale of bonds, with the exception of the calculation of interest. Consequently, the University contract is susceptible to two competing interpretations: the facilities are to be paid for with voter-approved bond funds; or, the facilities are to be paid for with either voter-approved bond funds or the "other funds" specified. Therefore, we find that the payment language of the University contract, in contrast to the other contracts discussed above, is ambiguous.

■■■ Having found that the University contract is ambiguous, we must next address the Authority's arguments that any interpretation of the contracts must be harmonized with certain "special considerations" applicable to government contracts, or else the contracts will be rendered void. As an initial matter, the Authority argues that, as a governmental entity, it has legislative discretion to allocate public bond funds for the benefit of the public, and the courts have no authority to interfere unless the governing body has acted illegally or abused its substantial discretion. *See Barrington v. Cokinos,* 161 Tex. 136, 338 S.W.2d 133, 142–43 (1960); *Inverness Forest Improvement Dist. v. Hardy Street Investors,* 541 S.W.2d 454, 460 (Tex.Civ. App.-Houston [1st Dist.] 1976, writ ref'd n.r.e.). However, once the Authority exercises its discretion to enter into a valid and

enforceable contract, it no longer has unfettered "legislative discretion" to decide what its obligations are and how it will perform those obligations. Whether the contracts here are enforceable and whether the Authority breached them is subject to review by the courts. *See, e.g., Winograd v. Clear Lake City Water Auth.,* 811 S.W.2d 147 (Tex.App.-Houston [1st Dist.] 1991, writ denied) (affirming judgment against Authority on jury verdict finding breach of contract and denial of due process and equal protection); *Clear Lake City Water Auth. v. Clear Lake Utils. Co.,* 549 S.W.2d 385 (Tex.1977) (construing Authority's obligations under a contract); *see also* TEX. WATER CODE § 49.066(a) ("district may sue and be sued in the courts of this state").

The Authority also contends that the contracts must be construed to allow it to decide whether and how it will pay because the Authority cannot surrender its legislative discretion to decide whether and how to allocate public funds. In essence, the Authority argues a "future board" of the Authority cannot be required to allocate funds for developer reimbursement. In support of this assertion, the Authority cites a single case, *Marco Dev. Corp. v. City of Cedar Falls,* 473 N.W.2d 41 (Iowa 1991). In *Marco Development,* the court refused to enforce the city's agreement to widen a street next to the developer's mall project because it found that the city could not contract for the performance of its

governmental functions. *See id.* at 42–43. We find *Marco Development* inapplicable because here the Authority has only agreed to pay for facilities; the fact that the payment is to be "allocated" for that purpose does not, in this circumstance, impermissibly restrict its ability to undertake its governmental functions. Indeed, the Authority is authorized by statute to contract for the joint construction, financing, ownership, and operation of water and drainage facilities, and such contracts may be of unlimited duration. *See* TEX. WATER CODE §§ 49.211, 213(a) & 49.213(c)(4). Nothing in the statutes governing the Authority limits its ability to pay its contractual obligations, and Texas courts have routinely enforced contracts requiring water districts to pay in the future. *See, e.g., Quincy Lee Co. v. Lodal & Bain Eng'rs, Inc.,* 602 S.W.2d 262, 264 (Tex.1980); *Harris County Mun. Util. Dist. No. 48 v. Mitchell,* 915 S.W.2d 859 (Tex.App.-Houston [1st Dist.] 1995, writ denied); *City of Houston v. Moody,* 572 S.W.2d 13 (Tex. Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.); *Brady v. Hidalgo County Water Control & Improvement Dist. No. 12,* 56 S.W.2d 298 (Tex.Civ.App.-San Antonio 1932), *aff'd,* 127 Tex. 123, 91 S.W.2d 1058 (1936).[11]

The Authority also argues that the Texas Constitution directly limits the power of water districts to incur debt. *See* TEX. CONST. art. XVI, § 59(c). Article XVI, section 59(c) provides in part that "[t]he Leg-

11. In connection with this issue, the Authority argues that because the Texas Constitution limits the legislature's discretion to create debt, *see* TEX. CONST. art. III, §§ 44, 49a, 50; art. IV, § 14; art. VIII, § 6, the Authority, as a creation of the legislature, is similarly limited and therefore cannot bind "future boards" of the Authority to allocate funds to pay for the facilities. We are unpersuaded that the constitutional limitations on legislative appropriations is applicable here, and the Authority cites no case law in which these limitations

were applied to a water district's contractual obligations. Similarly, the Authority argues that any interpretation of the contract that implies a requirement to appropriate future public funds, when no such requirement clearly and unmistakably appears on the face of the contract, violates the constitutional requirement of separation of powers. Again, we disagree that the contractual agreement to pay a portion of the cost of the facilities in these contracts impinges on the Authority's governmental functions.

islature shall authorize all such indebtedness as may be necessary to provide all improvements and the maintenance thereof requisite to the achievement of the purposes of this amendment." *See id.* The only limitation on that indebtedness is the requirement of voter approval for indebtedness to be paid by taxes. *See id.; Lower Colorado River Auth. v. McCraw*, 125 Tex. 268, 274, 83 S.W.2d 629, 633 (1935); *City of Houston v. Moody*, 572 S.W.2d 13, 15–16 (Tex.Civ.App.-Houston [1st Dist.] 1978, writ ref'd n.r.e.). The Authority cites no case law applying this constitutional provision to invalidate or limit a water district's contract in analogous circumstances.

In summary, we hold that the University contract is ambiguous, and we reject the Authority's arguments that our construction of the contract violates constitutional principles or impermissibly impinges on its governmental or legislative functions. However, as discussed in the next section, we find the trial court erred in submitting a single liability question incorporating an invalid theory of recovery. Accordingly, we reverse the trial court's judgment in favor of University and remand for trial.[12]

### B. *Casteel* Charge Error

The Authority next contends that there is *Casteel* error in the broad-form submission of the breach of contract liability question, because it cannot be determined whether the jury applied an invalid theory to find a breach. For the same reason, the Authority asserts the damages question is defective. Specifically, the Authority contends that the developers alleged three

theories of breach of contract in their pleadings, and that all three are invalid: (1) breach of the pay provision, (2) the "prevention doctrine," and (3) the "split format" theory. As to the first of these—breach of the pay provision—we have determined that University's breach of contract claim was properly before the jury. However, we agree with the Authority that the other breach of contract theories were invalid and should not have been considered by the jury as a basis for breach of contract. Because we cannot determine from the jury's answers the basis for their finding that the Authority failed to comply with its contracts, we find that the error is harmful, and we reverse and remand University's claims for trial.

Here, the trial court submitted a single question on liability under the contracts, which asked the jury the following: "Did the Water Authority fail to comply with the sales agreements, if any, entered into with the respective Plaintiffs?"[13] Beneath the question was a line for each developer in which the jury was to answer "yes" or "no." At the charge conference, the Authority timely and specifically objected to the question on the grounds now raised. The jury answered "yes" for each appellee, except as to the 1998 Taylor Lake contract.

As stated above, the two theories we find invalid are, as referred to by the Authority, the "prevention doctrine" and the "split format" theory. The "prevention doctrine" refers to actions of certain members of the Authority's board during

---

**12.** Because of our disposition of the case, we do not reach the Authority's argument that there was legally and factually insufficient evidence of developer interest, which was part of the damages award.

**13.** The question also included this instruction: "It is your duty to interpret the meaning of the written agreements of the parties in this case. To interpret each agreement, you must consider, in addition to the language in the agreements, the facts and circumstances surrounding the making of the agreement, the interpretation placed on the agreement by the parties, and the conduct of the parties."

the May and October 1998 bond elections because the developers allege that those actions prevented the passage of the bond proposals that would have authorized the sale of additional bonds to pay them. The "split format theory" refers to the developers' argument that the Authority's decision to split the bond propositions in the October 1998 bond election into one for developer reimbursements and one for water system necessities caused the bond proposition for developer reimbursements to fail. Both were specifically alleged in appellees' petition as bases for breach of contract. As we have already discussed in section I.A.(1)(c) above, we do not find either the prevention doctrine or the split format theory to be a valid basis for breach of contract in this case. Under *Crown Life Insurance Co. v. Casteel,* 22 S.W.3d 378 (Tex. 2000), "when a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." *Id.* at 389. Here, we are unable to determine whether the jury based its conclusion on the actions of Yoder or other board members in opposing the bond propositions for developer reimbursement, or on the Authority's decision to split the bond propositions, or something else. The problem is compounded by the trial court's instruction to the jury to interpret the contracts without specifying which provisions they were to interpret. Therefore, we must conclude that the error was harmful, and reverse and remand University's claims for new trial.

## II. Appellees' Alternative Grounds for Recovery

### A. Quantum Meruit

Alternatively, appellees argue that they should be allowed to recover on their quantum meruit claim. Quantum meruit is an equitable remedy which does not arise out of a contract, but is independent of it. *Vortt Exploration Co. v. Chevron U.S.A., Inc.,* 787 S.W.2d 942, 944 (Tex. 1990). To recover under quantum meruit, a claimant must prove that: (1) valuable services were rendered or materials furnished; (2) for the person sought to be charged; (3) which services and materials were accepted by the person sought to be charged, used and enjoyed by him; (4) under such circumstances as reasonably notified the person sought to be charged that the plaintiff in performing such services was expecting to be paid by the person sought to be charged. *Id.*

Appellants first contend that they are entitled to recover on quantum meruit because liability was judicially admitted by the Authority's counsel in closing argument. Appellants point to the statements by the Authority's counsel during his discussion of the jury charge, when he said that the jury question on quantum meruit liability should be answered "yes" and told the jury that, as to whether appellees provided compensable work to the Authority, "Of course. We've never disputed that. This issue isn't whether the private developers did something of value. The issue is when and how they ought to be paid." Appellees also point to the Authority's counsel's arguments to the jury that they should not award more than the 70% figure calculated by appellees' expert, and requesting that the jury award that amount as the reasonable value of the compensable work performed by the plaintiffs. We have reviewed the record and find that the statements of the Authority's counsel do not constitute a judicial admission.

A judicial admission must be clear, deliberate, and unequivocal. *Regency Advantage Ltd. P'ship v. Bingo Idea–Watauga, Inc.*, 936 S.W.2d 275, 278 (Tex. 1996). During closing argument, the Authority's counsel began his discussion of the jury question on quantum meruit liability by stating that "this one should not be applicable." He went on to argue that whether appellees did something of value was undisputed—what was at issue was whether they had contractually agreed to be paid for that work when the voters approved payment from bond proceeds:

> This issue isn't whether the private developers did something of value. The issue is how and when they ought to be paid.
>
> Question three should be answered yes. They were going to be paid 70 percent of their reimbursable expenses out of voter-approved bond funds. That's an easy one. They may still be paid, if, as and when a future election authorizes the use of funds to pay them. And as the Court told you, this is an unlimited duration contract.

The Authority's counsel also addressed the question of quantum meruit damages by arguing that under the contracts, the developers were only going to get reimbursed 70% of the cost of the facilities, and therefore they should not be compensated for the reasonable value of their services in an amount greater than the amount they would have received under the contracts.

We do not find the Authority's statements to be a "clear, deliberate, and unequivocal" admission of quantum meruit liability. It is evident from the context that counsel was arguing that quantum meruit was not applicable, but if the jury was going to answer it in favor of appellees, they should award no more than the amount they agreed to be paid under the contracts. Even if counsel's statement

that it was "undisputed" that appellees "did something of value" were construed as an admission, at most it addresses only the first of the four necessary elements of quantum meruit. Therefore, we reject appellees' argument that the Authority judicially admitted liability in quantum meruit.

Appellees next argue that they satisfy the elements of quantum meruit because the Authority has accepted the facilities and is using them to provide water and sewer services to customers within its boundaries in accordance with its statutory duties, and it was reasonably notified that appellees expected payment for the facilities. However, recovery in quantum meruit is generally not available when there is an express contract covering the services or materials furnished. *See Vortt,* 787 S.W.2d at 944. In their brief, appellees mention that the existence of an express contract will not defeat a recovery in quantum meruit when the contract is deemed invalid, abandoned, or if it is partially performed without the fault of the party seeking to recover in quantum meruit, citing *W & W Oil Co. v. Capps,* 784 S.W.2d 536, 537–38 (Tex.App.-Tyler 1990, no writ), and *Angroson, Inc. v. Independent Communications, Inc.,* 711 S.W.2d 268, 271–72 (Tex.App.-Dallas 1986, writ ref'd n.r.e.), but they do not argue that any of these exceptions are applicable to them. In any event, we do not find the stated exceptions applicable to the facts of this case; therefore, we hold that the existence of express contracts prohibits appellees from recovering on the alternative ground of quantum meruit.

### B. Declaratory Judgment

Appellees also argue that the trial court's declaratory judgment is an alternative ground for the judgment which the Authority did not appeal. Appellees refer to that part of the reformed final

judgment in which the trial court ordered that "Pursuant to Chapter 37 of TEX. CIV. PRAC. & REM CODE, the Clear Lake City Water Authority is obligated under its contract with Plaintiffs to purchase Plaintiffs' sewer, water, and drainage Facilities and its Board of Directors shall take any and all actions required to purchase the Facilities." Appellees contend that the Authority did not raise any challenge in its brief to this declaration, and any complaint about it is therefore waived. They also contend that the Authority judicially admitted what a reasonable price for the facilities would be. For this assertion, appellees again rely on the Authority's counsel's closing remarks about the reasonable value of the compensable work performed by the plaintiffs in his statements to the jury regarding their answer to the quantum meruit damages question discussed above. However, a declaratory judgment action is not necessarily an action for affirmative relief. *See Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 164 (Tex.1993). The relief provided under the Declaratory Judgments Act is remedial only, and it serves only " 'to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations.' " *Id.* (citing TEX. CIV. PRAC. & REM.CODE § 37.002(b)). Here, the Authority has requested that we reverse "the judgment," which subsumes the declaratory judgment, because appellees' contract claims are infirm. The viability of the trial court's declaration is wholly dependent upon the existence of the contract liability the Authority challenges. Because we have found the Authority is not liable under its contracts with appellees, the relief granted pursuant to the Act cannot be sustained. Therefore, we hold that the trial court's declaration does not constitute an alternative ground upon which to sustain the judgment.

## III. Appellees' Cross–Point on Their Takings Claim

In a single cross-point, appellees contend the trial court erred in granting the Authority's directed verdict on their claim that the Authority's use and control of the facilities constitutes a taking of appellees' property without compensation in violation of Article I, Section 17 of the Texas Constitution. To recover under a theory that property has been taken by a governmental entity without adequate compensation, a plaintiff must establish the following: (1) that the government entity intentionally performed certain acts; (2) that resulted in the taking of the property; (3) for public use. *Gen. Servs. Comm'n v. Little–Tex Insulation Co.*, 39 S.W.3d 591, 598 (Tex.2001); *Loyd v. ECO Res., Inc.*, 956 S.W.2d 110, 128 (Tex.App.-Houston [14th Dist.] 1997, no writ). Property is taken for a public use only when there results to the public some definite right or use in the undertaking. *Loyd,* 956 S.W.2d at 128. Whether particular facts are enough to constitute a taking is a question of law. *Little–Tex Insulation,* 39 S.W.3d at 598.

Appellees argue that the evidence was sufficient to submit the claim to the jury, because it showed that the Authority, a governmental entity, took possession of appellees' facilities for public use to provide residents of the district with water, sewer, and drainage services, but has not, and said it will not, pay for the facilities. However, a governmental entity does not have the requisite intent under constitutional-takings jurisprudence when it withholds property or money from an entity in a contract dispute. *See Little–Tex,* 39 S.W.3d at 598–99; *see also Green Int'l, Inc. v. State,* 877 S.W.2d 428, 434 (Tex.App.-Austin 1994, writ dism'd) ("Even if the government were to withhold property or payment it believed to be due the

other party, the government would still be acting within the color of right to the extent it had a good faith belief that its actions were justified due to disagreements over payment due or performance under the contract."). Here, the Authority disputed appellees' contention that it was obligated under the contracts to pay appellees for their facilities as soon as possible with any available funds; therefore, it lacks the requisite intent. Accordingly, we overrule appellees' cross-point.

## CONCLUSION

We hold that the Kirby Lake, Miter, and Taylor Lake contracts unambiguously require the receipt of voter-approved bond funds as a condition precedent to payment by the Authority; accordingly, we reverse and render judgment in favor of the Authority against Kirby Lake, Miter, and Taylor Lake. We further hold that University's breach of contract claims are reversed and remanded for a new trial. We further hold that the trial court did not err in granting the Authority's motion for directed verdict on appellees' takings claim.

Former Chief Justice SCOTT BRISTER not participating.