The PETROLEUM WORKERS UNION
OF THE REPUBLIC OF
MEXICO, Appellant

v.

James GOMEZ, As Receiver for
Arriba Limited, Appellee

James Gomez, As Receiver for Arriba
Limited, and Carlos Ryerson,
Appellants

v.

The Petroleum Workers Union of the
Republic of Mexico, Appellee

NO. 14-14-00807-CV, NO. 14-14-00834-CV

Court of Appeals of Texas,
Houston (14th Dist.).

Opinion filed September 8, 2016.

Brian Alan Calhoun, Dallas, TX, for Appellee

Paul V. Simon, Michael Alan Coyke, Shane McClelland, Houston, TX, George Munoz, Washington, DC, WA, for Appellants

Panel consists of Justices Christopher, Jamison, and Wise.

## OPINION

Martha Hill Jamison, Justice

Who, if anyone, speaks for a Mexican union when the union leadership is mired in scandal? That is the central question in this three-way appeal concerning enforcement of a purported 2004 settlement agreement (the "Garnished Funds Agreement") attempting to finally resolve 30 years of litigation. Among other things, the Garnished Funds Agreement provided for the distribution of certain garnished funds held in a New York bank account between the Petroleum Workers Union of the Republic of Mexico (the "Union") and James Gomez, as receiver for Arriba Limited ("Arriba").[1] Other provisions of the Garnished Funds Agreement concerned whether and where Arriba could enforce a 1986 default judgment it had obtained against the Union (the "1986 Judgment"). Carlos Ryerson, a former attorney for the Union, alleged a separate agreement to receive a payment of $7 million from out of the Union's share of the garnished funds (the "Ryerson Agreement").

Ultimately, all of the garnished funds were sent to Mexico for a Mexican court to determine their ownership. Arriba and Ryerson then sued the Union for breach of the agreements, and the Union counterclaimed for wrongful garnishment and breach of fiduciary duty among other allegations. The key issue for the jury to decide at trial was whether Ryerson and Noe Moreno Alvarez had authority to sign the agreements on behalf of the Union. The jury found that both men had both actual and apparent authority to sign the Garnished Funds Agreement and Alvarez had actual and apparent authority to sign the Ryerson Agreement. In its judgment, the trial court declined to award monetary damages to any party but declared that Arriba was entitled to enforce the 1986 Judgment against the Union anywhere except in Mexico. The court further awarded Arriba its court costs.

In its appeal, the Union contends: (1) the Garnished Funds Agreement is illegal under Mexican Law and therefore cannot be enforced; (2) Arriba and Ryerson are precluded from enforcing the Garnished Funds Agreement under the doctrine of res judicata; (3) the evidence is legally and factually insufficient to support the jury's finding that the signatories had actual or apparent authority to sign the Garnished Funds Agreement; (4) the Garnished Funds Agreement lacked consideration; (5) the trial court should have applied Mexican law to the authority issues; (6) the trial court erred in its jury instruction on apparent authority; (7) the trial court erred in denying motions for mistrial when evidence was revealed to the jury that had

---

1. In 1998, Gomez was appointed as the receiver for Arriba by a Bahamian court due to a disagreement between its two equal owners. Gomez, acting in his role as receiver, will be referred to as "Arriba" when necessary for clarity.

not been timely disclosed in discovery; and (8) the trial court erred in refusing to submit jury questions regarding the Union's counterclaims for wrongful garnishment and breach of fiduciary duty. In their respective appeals, Arriba and Ryerson contend the trial court erred in failing to award them monetary damages for breach of the Garnished Funds Agreement and the Ryerson Agreement. We affirm.

## I. Background

The parties largely agree on the order of relevant events and the identities of the key players. The main factual disagreements revolve around the relationships between the players and the events. Essentially, Arriba contends that the Union has regularly employed a scheme of using certain people or entities to enter agreements and then claiming that those people or entities were without authority to bind the Union. Meanwhile, the Union asserts that Arriba has continually dealt with people and entities that did not have authority to bind the Union and then has sought to hold the Union accountable for the other parties' promises.

## A. The 1984 Contract and 1986 Judgment

The relevant history begins in 1984 when Texas attorney David Black and businessman Billy · Flanigan approached certain Mexican individuals—whom Black and others testified represented the Union—with a proposal for the refinement of residual oil from Mexican refineries.[2] According to Black, the Mexican refineries were unable to process certain grades of crude oil and thus left the unrefined oil in ponds on refinery property. The proposal involved bringing the oil to refineries in the United States for processing, with all concerned parties profiting from the venture.[3] According to Black, in agreeing to the deal, the Union required that Black and Flanigan form a corporation outside of the United States. Therefore, the corporation they formed, Arriba, was incorporated in the Bahamas. A contract was entered between Arriba and The Comision de Contratos del Sindicato de Trabajadores Petroleros de la Republica Mexicana (the "Commission"), which evidence indicated was the "contracting arm" of the Union.[4] The terms of the agreement guaranteed that a minimum of six million barrels of residual oil would be conveyed.

In June 1985, Arriba filed a lawsuit against the Union, the Commission, and certain individuals in Harris County, Texas (sometimes, the "Judgment Debtors"), alleging breach of the 1984 contract. When the Union failed to answer in the lawsuit,

**2.** Flanigan was deceased by the time of trial in the present case.

**3.** The oil industry in Mexico has been nationalized and is controlled by the state-owned petroleum company Petróleos Mexicanos, better known as "Pemex." The Union is an association organized for the benefit of Mexican oil industry workers. It is unclear from the record exactly how the Union was authorized to sell residual oil, but there is some indication that Pemex was aware of the arrangement.

**4.** Apparently, as a nonprofit institution in Mexico, the Union was not permitted to enter for-profit contracts. Evidence indicated that the Commission acted as the Union's agent in signing contracts that the Union was then to perform and that there was a very close association between the two entities, including shared leadership. *See Comm'n of Contracts of Gen. Exec. Comm. v. Arriba, Ltd.*, 882 S.W.2d 576, 580 (Tex.App.—Houston [1st Dist.] 1994, no pet.) ("The Commission ... is a Mexican civil society of Union members operating as a construction company, which was authorized during the relevant time period to enter into commercial contracts on behalf of the Union.").

Arriba took a default judgment for over $92 million in 1986.[5]

## B. The Joint Venture Agreement, Release of 1986 Judgment, Resulting Litigation, and Second Judgment

According to Black, he then began seeking assets of the Judgment Debtors in the United States and managed to discover a safe deposit box owned by one of the individual defendants. As described by Black, Arriba soon was approached by Union representatives with an interest in resolving their disputes. A new agreement was entered in 1987, a joint venture between Arriba and Comater, S. de R.L. ("Comater").[6] Under the joint venture agreement, Comater promised to deliver residual oil from Mexico to be refined in the United States. As part of this deal, Arriba signed a release of its claims against the Judgment Debtors. According to Black, as a part of the joint venture agreement negotiations, he and the Comater representative were flown to Mexico by Pemex jet to meet with the founder and then-Secretary General of the Union, Joaquin Hernandez Galacia (also known as "LaQuina").

It is undisputed that no residual oil was provided by Comater or the Union pursuant to the joint venture agreement. Thus, Arriba filed a new lawsuit in 1989, alleging breach of the joint venture agreement and claiming that the 1987 release was unsupported by consideration. Arriba named the Judgment Debtors as defendants but not

Comater. Arriba received another default judgment in 1989 ("Second Judgment"). Among other things, the Second Judgment purported to rescind the 1987 release and revive the 1986 Judgment.[7]

In 1990, the Union filed a bill of review seeking dismissal of the Second Judgment. Although the trial court denied relief, the First Court of Appeals reversed the trial court and remanded for trial. *See Comm'n of Contracts of Gen. Exec. Comm. v. Arriba, Ltd.*, 882 S.W.2d 576 (Tex.App.—Houston [1st Dist.] 1994, no pet.).[8] After a jury trial, the trial court entered a take-nothing judgment against Arriba, which was reversed and remanded on appeal. *Arriba, Ltd. v. The Petroleum Workers Union of the Republic of Mex.*, No. 10–98–00165–CV, slip op. at 5–7 (Tex.App.—Waco Oct. 27, 1999, pet. denied). That proceeding is still pending in the trial court.

## C. Garnishment of Funds in New York

In May 2002, at the behest of the Mexican government, the United States government obtained a restraining order in a United States district court in New York freezing approximately $43 million in a New York bank account. Allegedly, these funds had been embezzled as a part of the Mexican political scandal commonly referred to as "Pemexgate."[9] Related to this scandal, the Union's Secretary General at the time, Carlos Romero Deschamps, and the Union's second in command, Ricardo

---

5. The Union disputes it received proper notice of this lawsuit.

6. Black testified that Union representatives told him that the joint venture agreement needed to be executed with Comater "for the Union" due to negative publicity in Mexico related to the 1986 Judgment.

7. The Second Judgment also found that the underlying obligation is "just and does not violate Mexican law or public policy."

8. Also in 1990, the then-Attorney General of Mexico apparently authored an official communique which the Union argues declared that agreements for the sale of Mexican oil such as the 1984 contract and the joint venture agreement were void and unenforceable under Mexican law.

9. It is unclear from the record, and apparently disputed, as to whether these funds rightfully belonged to the Union or Pemex.

Aldana Prieto, were charged with crimes. The allegations suggested the money was to be used to illegally fund a presidential campaign in the Mexican elections. Arriba filed its own garnishment action against the funds in the Harris County trial court.

Arriba then sought to negotiate a settlement of all claims between the parties.[10] But with the leadership of the Union in disarray, who could speak for the Union in such negotiations and enter into a binding settlement agreement? It is the resulting Garnished Funds Agreement, and the alleged breach thereof, that is the immediate subject of the present appeal, and the key issue is whether the individuals purporting to represent the Union were truly authorized to do so.

### D. Negotiations and Garnished Funds Agreement

At this time, Arriba was represented by Stan Nelson, a Texas attorney hired by the receiver, Gomez. Nelson and Black negotiated on behalf of Arriba primarily with Ryerson, a Texas attorney who began representing the Union in Arriba matters in 1990. Ryerson was hired to represent the Union by one of its Mexican lawyers, Ruben Choreno. As part of his duties, Ryerson, who is not a trial attorney, hired other lawyers to take the lead at trial and in the appeals, but, according to numerous witnesses, continued to provide assistance and direction to the litigators and appellate specialists and maintain client contact. The Union contends, however, that by the time the funds were restrained in New York, Ryerson was no longer actively engaged in representing the Union, having taken an in-house counsel position with another company. Ryerson and Arriba, on the other hand, assert that Ryerson was always involved on some level in the Union-Arriba matters and was never relieved of his duties for the Union until after the Garnished Funds Agreement was signed. Ryerson stated that his employer was fully aware of and approved his continued work on Arriba matters while he was employed with the company.

Ryerson testified that, given the charges against the top leaders of the Union, he wanted to ensure that whomever he dealt with from the Union had the proper authority. He named three men as his primary contacts regarding settlement: Choreno, LaQuina, and Alvarez. According to Ryerson, Choreno and Alvarez both had valid powers of attorney from the Union, Choreno was a long-time lawyer for the Union, and either Choreno or LaQuina told Ryerson to deal with Alvarez on Union business. Ryerson stated that he also confirmed Choreno's and LaQuina's authority with the office of Mexican President Vicente Fox. The Union points out that during that time period, LaQuina had no official role within the Union, after having served a prison sentence on weapons charges, and that Choreno had been replaced on Arriba-related matters by a different attorney, Eduardo Gonzalez, years before the Garnished Funds Agreement was entered.[11] The Union refers to Alvarez as "a mystery man with no discernible connection to the Union." The Union further challenges the validity of Choreno's and Alvarez's powers of attorney.

---

10. The negotiations also apparently involved the possibility that Arriba and the Union would work together to pursue other funds embezzled from the Union, but the Garnished Funds Agreement did not include any provisions regarding such a joint venture.

11. There was testimony that LaQuina's conviction was "political payback" for his refusal to support a particular presidential candidate. In his testimony, Gonzalez attempted to minimize Ryerson's role; however, his testimony was at times inconsistent and was contradicted to some degree by another of the Union's witnesses.

The Garnished Funds Agreement was signed in the Bahamas in May 2004 by Gomez, on behalf of Arriba, and Ryerson and Alvarez, on behalf of the Union and the Commission. Prior to its execution, a Bahamian attorney working for Gomez, Ruth Bowe-Darville, purportedly verified Alvarez's identity.

Under article III of the Garnished Funds Agreement, Arriba was to receive 52 percent of the garnished funds and the Union was to receive the remainder, minus $1 million to Gomez for his expenses as Arriba's receiver. Article III further provides that the parties would "use their best efforts to resolve any outstanding claims affecting the Garnished Funds that have been made, or which may be made, in the action pending in the United States District Court, Eastern District of New York." Under article IV, the agreement provided that the Union waived any claims challenging the validity of the 1986 Judgment and would not contest enforcement of that judgment. The agreement, however, limited to some degree Arriba's ability to collect. First, it specified that Arriba would not attempt to enforce the 1986 Judgment prior to distribution of the garnished funds. Then, if for some reason the garnished funds were not distributed according to the terms of the agreement, Arriba could enforce the judgment "in any legal manner, anywhere in the world, except in the country of Mexico." But, if the funds were distributed according to the agreement, the judgment then "could be enforced anywhere without restriction." Alvarez also signed a separate agreement in November 2004 purportedly binding the Union to pay Ryerson $7 million in legal fees, also out of its 48 percent share of the garnished funds.

It was undisputed at trial that the individuals negotiating the agreements intentionally did not share such information with Deschamps or Prieto, who were at the time still, respectively, the Secretary General and number two official of the Union. The Union identifies this fact as evidence that the negotiators were not authorized to settle the case on behalf of the Union; whereas, Arriba and Ryerson contend that this secrecy made sense, as Deschamps and Prieto were facing criminal charges at the time.[12]

On August 21, 2006, the trial court dissolved Arriba's and Ryerson's writs of garnishment.[13] The funds were released to the United States government which subsequently transferred them to the Mexican government. In October 2008, the Union obtained a judgment in a Mexican court declaring both the settlement agreement and Ryerson's fee agreement to be nullities. The Union subsequently sought to domesticate this judgment in the court below, urging in a motion for summary judgment the preclusive effect of the foreign judgment. The trial court denied the motion.

### E. Course of the Current Litigation

In the present lawsuit, Arriba seeks monetary damages for breach of the Garnished Funds Agreement as well as specific performance to collect on the 1986 Judgment. Ryerson seeks monetary damages as well as attorney's fees for breach of the Ryerson Agreement and claims the Union committed fraud. The Union raises claims

12. Ultimately, neither Deschamps nor Prieto was convicted of the crimes charged and both retained their positions in the Union.

13. The Mexican attorney general had filed an amicus curiae brief in this matter in 2005 requesting that the writs be dissolved so that the funds could be sent back to Mexico. In the brief, the attorney general noted that it was suspected the money had been embezzled.

of fraud and conspiracy as well as wrongful garnishment and breach of fiduciary duty.

The jury determined that Ryerson and Alvarez each had both actual and apparent authority to sign the Garnished Funds Agreement on behalf of the Union and that Alvarez had actual and apparent authority to sign the Ryerson Agreement on behalf of the Union. The jury further found that Ryerson did not commit fraud against the Union, the Union did not defraud Ryerson, and Ryerson and Arriba did not conspire to harm the Union. Lastly, the jury found reasonable and necessary attorney's fees for Ryerson in prosecuting his breach of contract claim. The trial court refused to submit the Union's counterclaims for wrongful garnishment or breach of a fiduciary duty to the jury.

In its final judgment, the trial court held that Arriba and Ryerson should take nothing on their claims for damages but that Arriba was entitled to recover on its claim for specific performance of article IV of the Garnished Funds Agreement. More specifically, the court ordered that Arriba was "entitled to enforce the [1986 Judgment] in any legal manner, anywhere in the world, except in the country of Mexico." In a separate "Opinion and Order," the trial court further explained that the Garnished Funds Agreement itself provided that Arriba was to recover money only if the New York funds were released pursuant to the writs of garnishment, and if the funds were not so released, the agreement provided that Arriba would be entitled to enforce the 1986 Judgment in any legal manner anywhere in the world except Mexico. Since the trial court dissolved the

writs and the funds were not released pursuant to the writs, the trial court concluded that Arriba was not entitled to monetary damages but was entitled to the bargained for specific performance on the 1986 Judgment. All parties have appealed.

## II. The Union's Appeal

### A. Legality of Agreements

In its first issue, the Union contends that the Garnished Funds Agreement was illegal under Mexican law and therefore unenforceable as a matter of law. *See Cruse v. O'Quinn*, 273 S.W.3d 766, 776 (Tex.App.—Houston [14th Dist.] 2008, pet. denied) (explaining that contracts requiring performance that violates the law are unenforceable). The Union bases its contention on a declaration issued by the Mexican Attorney General in 1990. The translation of the declaration in the record appears to be a partial document.[14] It purports to be a response to a request from Pemex that the attorney general review pleadings in a different lawsuit, between Arriba and Pemex, and offer an opinion on whether the Union was permitted to enter contracts involving the sale of Mexican oil. The attorney general apparently concludes that such arrangements are illegal under Mexican law. The Union contends that this declaration establishes that the 1984 contract was illegal and, thus, by extension, the 1986 Judgment and the Garnished Funds Agreement are illegal and unenforceable.

The Union pleaded illegality of the Garnished Funds Agreement as an affirmative defense.[15] It acknowledged at oral argu-

14. The first page of the translation is numbered as page 19 and the first full paragraph is numbered as paragraph 19. There is also a continuation of a footnote on that first page from a prior page. In the original Spanish declaration, the paragraphs are not numbered and there are no footnotes.

15. The Union's live pleading states, in part, "it was illegal . . . for anyone in Mexico (other

ment, however, that the first time it requested a ruling from the trial court on the issue of illegality was when it made its objections to the jury charge. At that point, the Union objected generally to questions one and two based on the illegality of the Garnished Funds Agreement and underlying 1984 contract. The Union did not at that time mention the declaration.[16] Subsequently, after the jury returned its verdict, the Union again asserted illegality—and again failed to reference the declaration—in its motion for judgment notwithstanding the verdict. When asked by the trial judge at the hearing on the motion whether the Union had any evidence to support its illegality claim, the Union responded by pointing generally to testimony by its own attorney, George Munoz, and requesting that the trial court take judicial notice of a motion for summary judgment filed in the still–pending joint venture case.[17] The trial court appears to have declined to take judicial notice. Only after the hearing did the Union finally mention the declaration, offering it as an exhibit to the Union's Post-Hearing Brief.[18] Nothing in the record suggests that the trial court accepted or considered the declaration for purposes of assessing the legality of the settlement agreement.

Texas law prescribes specific procedures for proving and determining the law of foreign countries. These procedures are principally set forth in Texas Rule of Evidence 203, which states in full:

**Rule 203.** Determining Foreign Law

**(a) Raising a Foreign Law Issue.** A party who intends to raise an issue about a foreign country's law must:

(1) give reasonable notice by a pleading or other writing; and

(2) at least 30 days before trial, supply all parties a copy of any written materials or sources the party intends to use to prove the foreign law.

**(b) Translations.** If the materials or sources were originally written in a language other than English, the party intending to rely on them must, at least 30 days before trial, supply all parties both a copy of the foreign language text and an English translation.

**(c) Materials the Court May Consider; Notice.** In determining foreign law, the court may consider any material or source, whether or not admissible. If the court considers any material or source not submitted by a party, it must give all parties notice and a reasonable opportunity to comment and submit additional materials.

**(d) Determination and Review.** The court—not the jury—must determine foreign law. The court's determination must be treated as a ruling on a question of law.

■ Rule 203 is often described as a "hybrid rule by which the presentation of the foreign law to the court resembles the presentment of evidence but which ulti-

---

than Pemex) to sell oil or petroleum of any kind."

**16.** The declaration was at that point already in the trial court's record as it was originally attached to an amicus curiae brief by the Mexican Attorney General seeking return of the New York funds to Mexico. The declaration was not, however, introduced at trial.

**17.** A Union attorney at the hearing stated: "[W]e believe that there is testimony in the

record from Mr. Munoz, or one of the other Union witnesses, to the fact that the underlying '84 contract was illegal and it violated the laws of Mexico." The Union does not rely in its brief on this evidence.

**18.** The section of the brief on illegality begins, "During the hearing, the Court also asked about evidence supporting the Union's illegality defense . . . ."

mately is decided as a question of law." *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A. de C.V.*, 49 S.W.3d 347, 351 (Tex.2001). The Rule 203 procedures must be strictly followed for the determination of foreign law. *Cal Dive Offshore Contractors Inc. v. Bryant*, 478 S.W.3d 914, 920–21 (Tex.App.—Houston [14th Dist.] 2015, no pet.). A party relying on foreign law must strictly plead and prove the law. *Nguyen v. Nguyen*, 355 S.W.3d 82, 89 (Tex.App.—Houston [1st Dist.] 2011, pet. denied).

■ . The Union does not mention Rule 203, much less assert that it fulfilled any of the rule's requirements in presenting the Mexican Attorney General's declaration. The Union instead relies on two federal cases for the proposition that it proved illegality as a matter of law through the declaration: *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942) and *D'Angelo v. Petroleos Mexicanos*, 422 F.Supp. 1280 (D.Del.1976). In both of these cases, however, the party seeking to establish foreign law timely and properly presented evidence to prove the substance of that law. *See Pink*, 315 U.S. at 220–21, 62 S.Ct. 552 (considering official declaration of Russian law by Commissariat for Justice when it was properly presented as evidence pursuant to New York procedural law and holding referee's determination regarding authority of Commissariat was supported by evidence); *D'Angelo*, 422 F.Supp. 1284–85 (examining expert testimony in concluding that declaration by Mexican attorney general should be accepted as an "official declaration" of Mexican law in the absence of an adjudication by a Mexican court).[19]

Here, the Union neither timely offered the declaration pursuant to Rule 203 nor established illegality as a matter of law. The Union's attachment of the attorney general declaration to a post-hearing brief on its JNOV motion did not conclusively establish the illegality of the agreements as the Union contends. Accordingly, we overrule the Union's first issue.

## B. Res Judicata & Collateral Estoppel

In its second issue, the Union contends that Arriba and Ryerson's claims based on the Garnished Funds Agreement are barred by the doctrines of res judicata and collateral estoppel due to a 2008 judgment the Union obtained from a Mexican court holding that the settlement agreement was a nullity. The Union asserts that it met all of the requirements for filing foreign judgments for full recognition, *see* Texas Civil Practice and Remedies Code chapter 36 (the Uniform Foreign Country Money—Judgments Recognition Act) and Arriba or Ryerson failed to object.

■ "Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex.1996). It requires proof of (1) a prior final judgment on the merits by a court of competent jurisdiction, (2) identity of parties or those in privity with them, and (3) a second action based on the same claims as were raised or could have been raised in the first action. *Id.* "[C]ollateral estoppel precludes relitigation of ultimate issues of fact actually litigated and essential to the judgment in a prior suit." *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794, 801 (Tex.

---

19. The Union may be intending to rely on the *D'Angelo* court's holding that the Mexican Attorney General's declaration in that case was an "official declaration" of Mexican law to establish that the declaration in the present case is also an "official declaration" of Mexican law. However, the decision by the court in *D'Angelo* was based on the evidence presented in that case. 422 F.Supp. 1284–85. No such evidence has been presented here.

1992). A party asserting the doctrine must prove that (1) the facts sought to be litigated in the second action were fully and fairly litigated in the first action, (2) the facts were essential to the judgment in the first action, and (3) the party against whom collateral estoppel is sought was a party in the first action. *Eagle Props., Ltd. v. Scharbauer*, 807 S.W.2d 714, 721 (Tex. 1990).

Under chapter 36 of the Civil Practice and Remedies Code, a foreign judgment that meets the requirements of the chapter, is filed with proper notice, and is not refused recognition for the grounds specified in the chapter, becomes "conclusive between the parties to the extent that it grants or denies recovery of a sum of money." Tex. Civ. Prac. & Rem. Code § 36.004. Sections 36.0042 and 36.0043 set forth detailed rules for notice, requiring that the party seeking recognition file an affidavit with the court clerk providing identifying information for the judgment creditor and debtor so that the clerk can ensure notice or, alternatively, provide proof that notice of the filing of the foreign judgment was mailed to the other party. *Id.* §§ 36.0042–.0043. Sections 36.0044 and 36.005 set forth, respectively, the procedures for contesting recognition and available grounds for nonrecognition. *Id.* §§ 36.0044–.005. Under section 36.005(a)(2), a foreign judgment is not considered conclusive if the foreign country did not have personal jurisdiction over the defendant. Section 36.006 further governs when a court can refuse to recognize a foreign judgment because the issuing court lacked personal jurisdiction over the defendant. *Id.* § 36.006.

Arriba filed its motion to enforce the Garnished Funds Agreement in March

2005. In January 2006, the Union filed a lawsuit in a Mexican court challenging the validity of the agreement. Arriba and Ryerson have steadfastly maintained that they never received notice of the Mexican lawsuit; indeed, they made no appearance in the Mexican court, and the equivalent of a default judgment was entered in October 2008, holding, among other specifics, that the Garnished Funds Agreement was a nullity. In March 2012, the Union alleges it filed a Notice of Filing of Foreign Country Judgment with the Harris County Clerk's Office, seeking to domesticate the Mexican judgment. The notice of filing is not in our record.[20]

▆ The Union thereafter raised its res judicata and collateral estoppel defenses in the present action in two motions for partial summary judgment and its motion for JNOV, attaching the Mexican judgment to each motion.[21] In their responses to the Union's motions, Arriba and Ryerson raised numerous grounds on which the trial court could have denied the motions, including challenging the Union's contentions regarding notice and asserting that the Mexican judgment did not meet the requirement under chapter 36 that the foreign judgment grant or deny a sum of money, the Union failed to properly plead res judicata or collateral estoppel and these affirmative defenses were not tried by consent, the Mexican court was not the proper court to decide the matter, they were not properly served with the Mexican lawsuit, the Texas district court had dominant jurisdiction because the Texas case was filed first, the Mexican court lacked personal jurisdiction over Arriba, the Mexican judgment violated choice of law and choice of forum clauses, and the Union failed to present sufficient evidence to sup-

---

20. In its Motion for New Trial, the Union states its notice of filing of foreign judgment was assigned cause number 2012-16158.

21. The Union did not plead res judicata or collateral estoppel as an affirmative defense.

port a finding of res judicata or collateral estoppel. The trial court denied the first motion for summary judgment and the JNOV motion but did not rule on the second motion for summary judgment.[22] There was no mention of the Mexican judgment during trial.

In its opening brief to this court, the Union spends a little over one page setting forth procedural facts and then stating in conclusory fashion that the Mexican judgment was properly domesticated and thus any claims based on the settlement agreement are barred by res judicata and collateral estoppel. Citations to legal authority and the record are scant and unhelpful. The Union merely argues "Arriba unquestionably had notice of the Union's filing, yet it failed to file a motion for nonrecognition of the judgment within the time periods provided in section 36.0044." As it did in the trial court, the Union leaves most of the grounds appellees raised for denying the motions unaddressed in its briefing.[23] *See RSL Funding, LLC v. Pippins*, 424 S.W.3d 674, 687 n. 24 (Tex.App.—Houston [14th Dist.] 2014) ("It is well established in Texas that

when a trial court issues a ruling adverse to a party without specifying its grounds for doing so, the party on appeal must challenge each independent ground that was asserted by the appellees in the trial court."), *aff'd*, No. 14–0457, 499 S.W.3d 423, 434 (Tex. July 1, 2016) (affirming because appellant failed to challenge ground on which trial court could have ruled in denying motion); *see also* Tex. R. App. P. 38.1(i) (providing that an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). Although we construe briefs liberally, *see* Texas Rule of Appellate Procedure 38.9, we will not construct an argument where an appellant has not. *Lasik-Plus of Tex., P.C. v. Mattioli*, 418 S.W.3d 210, 222 (Tex.App.—Houston [14th Dist.] 2013, no pet.); *see also Jefferson Cty. v. Nguyen*, No. 09–13–00505–CV, 2015 WL 4597560, at *26 (Tex.App.—Beaumont July 31, 2015, no pet.) (mem. op.) (rejecting challenge to denial of motion for JNOV based on conclusory briefing). We overrule the second issue.

### C. Actual Authority

**22.** Denial of the motion for summary judgment did not preserve any issues raised therein. *See, e.g., Reese v. Duncan*, 80 S.W.3d 650, 665 (Tex.App.—Dallas 2002, pet. denied) ("If the trial court denies a motion for summary judgment and the case is tried on its merits, the order denying the summary judgment is not reviewable on appeal.").

**23.** A particular exchange of arguments regarding notice bears further examination. In response to the first motion, among other contentions, Arriba and Ryerson alleged a lack of proper notice of the filing seeking recognition of the foreign judgment. In the second and third motions, the Union asserted that Arriba and Ryerson's receipt of a copy of the Mexican judgment—as an attachment to the first motion—mooted their claim to have not received proper notice of the Union's domestication filing. The Union further argued that since Arriba and Ryerson had

notice and did not object to the domestication, the foreign judgment became conclusive on all claims premised on the validity of the settlement agreement. In support of its interpretation of the statute's notice provisions, the Union primarily cited cases from other jurisdictions. In response, Arriba and Ryerson reasserted that notice was insufficient and distinguished or attempted to distinguish the Union's cases. They further argued that if attaching the Mexican judgment to the first motion for summary judgment provided sufficient notice of the domestication filing, then Arriba and Ryerson's responses to that motion should be construed as objections to recognition of the foreign judgment under chapter 36. In its briefing to this court, the Union does not address these arguments and possible bases for the trial court's ruling. The Union also did not adequately do so in the trial court.

### 1. Legal Underpinnings

In its third issue, the Union contends that the evidence was legally and factually insufficient to support the jury's findings in response to jury question 1 that Alvarez and Ryerson had actual authority to sign the Garnished Funds Agreement on the Union's behalf.[24] When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002). In reviewing the factual sufficiency of the evidence, we consider all of the evidence and set aside the judgment only if it is so contrary to the overwhelming weight of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). The factfinder is the sole judge of witnesses' credibility and the weight to be given their testimony. *Keller*, 168 S.W.3d at 819.

Question 1 instructed the jury on actual authority as follows:

A party's conduct includes the conduct of another who acts with the party's actual authority.

Actual authority for another to act for a party must arise from the party's agreement that the other act on behalf and for the benefit of the party. If a party so authorizes another to perform an act that other party is also authorized to do whatever else is proper, usual, and necessary to perform the act expressly authorized.

Absent actual or apparent authority, an agent cannot bind a principal. *Flutobo, Inc. v. Holloway*, 419 S.W.3d 622, 630 (Tex.App.—Houston [14th Dist.] 2013, pet. denied). An agency relationship will not be presumed, and the party asserting the relationship has the burden to prove its existence. *MEMC Pasadena, Inc. v. Riddle Power, Inc.*, 472 S.W.3d 379, 399 (Tex.App.—Houston [14th Dist.] 2015, no pet.). Actual authority denotes authority that a principal intentionally confers upon an agent, or intentionally allows the agent to believe he has, or by want of ordinary care allows the agent to believe himself to possess. *Flutobo, Inc.*, 419 S.W.3d at 630–31. An agent has express authority when the principal makes it clear to the agent that it wants certain acts to be done; implied authority is the authority to do whatever is reasonably necessary and proper to carry out the agent's express powers. *Crooks v. M1 Real Estate Partners, Ltd.*, 238 S.W.3d 474, 483 (Tex.App.—Dallas 2007, pet. denied).

### 2. The Powers of Attorney

The Union argues that proof of actual authority in this case turns on the validity of the alleged powers of attorney given to Choreno (plaintiff's exhibit 22) and Alvarez (defendant's exhibit 50-B), since Arriba admitted it did not have direct discussions about the Garnished Funds Agreement with any Union official.[25] Agency, however, can be proven by

24. Although the Union makes all of its arguments in terms of "no evidence," it included language that essentially incorporated the same contentions in light of the factual sufficiency standards. We will therefore consider all of the union's arguments with both standards in mind.

25. Alvarez signed the Garnished Funds Agreement on behalf of the Union as did Ryerson,

direct or circumstantial evidence and does not require a power of attorney. *See MEMC Pasadena*, 472 S.W.3d at 399; *Walker Ins. Servs. v. Bottle Rock Power Corp.*, 108 S.W.3d 538, 549–50 (Tex.App.— Houston [14th Dist.] 2003, no pet.) ("Actual authority is created through written or spoken words or conduct of the principal communicated to the agent."); *see also* Restatement (Third) of Agency § 1.01 cmt. d (2006) ("A principal's manifestation of assent to an agency relationship may be informal, implicit, and nonspecific.").[26] Although, as will be discussed, the evidence in this case as to actual authority fell short of being conclusive, the jury did not act unreasonably in finding that Arriba established actual authority.

The Union begins its challenge to the powers of attorney by urging that the trial court should have applied Mexican law to the question of actual authority under the powers of attorney; it then relies on statements made by its experts regarding Mexican law that were presented in an offer of proof at the conclusion of trial. These arguments, however, are not well-placed in a challenge to the sufficiency of the evidence supporting the jury's actual authority finding. Since the trial judge overruled the

Union's motion to have Mexican law apply before trial began, the case was not tried under Mexican law. The jury never heard either the Union's or Arriba's experts on Mexican law, so that testimony is not relevant to a review of the evidence the jury did consider. *Cf. Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 275 (Tex.1995) (explaining that evidence cannot be deemed conclusive in a legal sufficiency review unless it was actually admitted into evidence); *Nat'l Family Care Life Ins. Co. v. Fletcher*, 57 S.W.3d 662, 671 (Tex.App.— Beaumont 2001, pet. denied) (holding fact that defendant's offer of proof cast doubt on plaintiff's damages calculation did not affect sufficiency review of damages award).[27] Therefore, we do not consider the offer of proof in reviewing the sufficiency of the evidence as to actual authority. The Union's arguments concerning the applicability of Mexican law are specifically addressed below under issue six, challenging the trial court's application of Texas law to the powers of attorney.

The two powers-of-attorney exhibits are somewhat difficult to read, as the originals are in Spanish and the translations are not always in standard English. Exhibit 22 purports to be a "General Power of Attor-

---

and Choreno was an attorney for the Union with whom Ryerson said he verified the Union's approval of the Garnished Funds Agreement. Exhibit 50-B does not appear to be a power of attorney itself, but is a notarized document confirming the existence of a power of attorney for Alvarez on behalf of the Union.

The Union suggests that because the Garnished Funds Agreement had spaces for two Union signatories, both Ryerson and Alvarez needed to have possessed actual (or apparent) authority in order to bind the Union to the agreement. The Union does not offer any legal argument for this suggestion but instead points out that Nelson, attorney for Arriba, wanted more than just Ryerson's signature on behalf of the Union. The Union does not explain how Nelson's preference meant that

Ryerson's signature alone would be insufficient to bind the Union.

26. As one witness described them, the powers of attorney were "icing on the cake" and not strictly necessary to prove actual authority.

27. In objecting to the Union's offer of proof, a lawyer representing Ryerson pointed out that Arriba and Ryerson had designated their own experts on Mexican law whom they expected, if called, to disagree substantively with the Union's experts. *See Faircloth*, 898 S.W.2d at 275 (citing *Martin v. Allman*, 668 S.W.2d 795, 799 (Tex.App.—Dallas 1984, no writ) as holding that a party is entitled to rely on a favorable ruling and need not rebut evidence tendered by an opposing party in a bill of exceptions).

ney" from the Union in favor of Choreno, authorizing him, among other things, to "bring all types of suits, file complaints and litigations, *desist from proceedings* even from proceedings of relief, *compromise*, challenge, *bind in arbitration*." (Emphasis added.) The highlighted language could certainly be read by the jury as supporting the notion that Choreno could settle lawsuits on behalf of the Union. Exhibit 50-B is more difficult to understand, but it references and purports to quote from a document deeming Alvarez a "General Attorney in Fact of the Oil Workers of the Mexican Republic's Union, S.C." It is not clearly explained in the record what difference the added "S.C." makes.[28] Exhibit 50-B further notes that Alvarez possessed the authority "to initiate a defense action, desisting of actions, trails [sic] and recourses ... to celebrate all kinds of contracts." It is a little more difficult to determine exactly what Alvarez was authorized to do under his purported power of attorney, but the jury could have reasonably concluded based on this document that the Union, at least at one point, placed a certain amount of trust and authority with Alvarez.

The Union additionally complains that the powers of attorney did not contain any language specifically authorizing Choreno or Alvarez to settle the case or permitting Choreno to delegate any authority to Ryerson or Alvarez to sign the agreement, citing *In re Estate of Miller*, 446 S.W.3d 445, 455 (Tex.App.—Tyler 2014, no pet.) (stating powers of attorney should be strictly construed), and *Hardy v. Robinson*, 170 S.W.3d 777, 780 (Tex.App.—Waco 2005, no pet.) ("The nature and extent of the authority granted must be ascertained from the instrument granting the power of attorney.").[29] Ultimately, even if the powers of attorney did not directly establish the authority of Choreno and Alvarez to settle the claims at issue, they constitute evidence that Choreno and Alvarez were individuals that the Union had used as agents in the past and were possibly using as agents at the time of the Garnished Funds Agreement. The documents could be reasonably interpreted as indicating Choreno and Alvarez had authority to settle lawsuits at least at some point in time.

### 3. Ryerson's Testimony and Other Evidence

Contrary to the Union's emphasis, however, the evidence offered to support the actual authority claim was not limited to the powers of attorney. Much of the additional evidence came in testimony from and regarding Ryerson. Ryerson testified that he had been hired to represent the Union in the subject litigation. He acknowledged that his relationship with the Union did not permit him to settle the case without the Union's authorization, but he steadfastly maintained that he received that authorization. The Union, on the other hand, portrays Ryerson's representation of

28. Citing only their expert's testimony in the offer of proof, the Union states that the "S.C." designation refers to a "civil society" under Mexican law, and that the entity was distinct from the Union itself. As stated above, the expert's testimony was not admitted at trial. However, testimony was admitted indicating that the Union sometimes used related entities, such as the Commission and Comater, to transact business.

29. The Union further assails Alvarez's purported power of attorney as not having been signed by the principal as required by section 751.002 of the Texas Estates Code. As mentioned above, however, Exhibit 50-B was not Alvarez's actual power of attorney, but a notarized statement confirming the existence of a power of attorney. Additionally, the Union does not cite where it made this argument below. Regardless, as stated, the validity of the powers of attorney was not an essential element of proof in this case.

the Union as having dwindled to essentially nothing by the time the Garnished Funds Agreement was signed and suggests that Ryerson and others without proper authority "cooked up" the settlement to defraud the Union. *See generally City of Keller*, 168 S.W.3d at 820 ("It is the province of the jury to resolve conflicts in the evidence. Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict.").

Ryerson testified that Choreno hired him to represent the Union in matters pertaining to Arriba in 1990 and that he remained counsel for the Union until he filed his intervention in the present case in February 2005. Documentary and testimonial evidence showed that Ryerson was the lead attorney for the Union in Arriba matters for many years, with authority to hire other lawyers and generally guide the litigation. Ryerson stated that the Union consistently left it solely to him to protect their interests in these matters. It is undisputed that no documents were filed with the trial court or communications made to opposing parties in this matter indicating Ryerson was no longer representing the Union prior to execution of the Garnished Funds Agreement. David Black, an attorney and part owner of Arriba, testified that he considered Ryerson to be his main legal adversary from 1990 to 2004 and that he dealt "constantly" with Ryerson during that time period. Nelson, Arriba's attorney for many years of litigation, stated that Ryerson was the Union's lead attorney and clearly was the attorney with the closest relationship with the Union itself.

The Union presented Eduardo Gonzalez as its chief witness to portray Ryerson as effectively no longer representing the Union at the time the Garnished Funds Agreement was signed. Gonzalez, external counsel for the Union in Mexico, replaced Choreno in overseeing the Arriba cases for the Union in 1992. He described Ryerson's participation as dwindling to nothing, as he only attended the 1997 trial for about 15 minutes and had taken an in-house counsel job with another company. Several aspects of Gonzalez's testimony, however, were disputed by other witnesses. For example, the Union's trial counsel for the 1997 trial, Bill Burke, testified that Ryerson attended the entire trial and was active in both developing the case and communicating with the client. Additionally, Gonzalez stated that if Ryerson wanted to contact the client, he should have gone through Gonzalez, but several witnesses, including Burke, described Ryerson as having a close working relationship with the Union.[30] As sole judge of witness credibility, the jury was free to discount any or all of Gonzalez's testimony. *See Keller*, 168 S.W.3d at 819.[31]

---

[30] Gonzalez further stated that no one could sign a Garnished Funds Agreement on behalf of the Union except the secretary general, but he offered no support for this assertion and several witnesses testified generally that it was not unusual for non-officers to sign such agreements on behalf of an entity. Gonzalez acknowledged that the engagement letter Burke signed directly with the Union noted Ryerson was still the principal attorney in the litigation, but according to Gonzalez, at that point, Ryerson had no real power on behalf of the Union. For his part, Ryerson explained his lack of activity in matters pertaining to Arriba subsequent to trial by pointing out that there was simply not much going on from 1998 until the funds were garnished in New York in 2002. Burke also stated that when Ryerson went in-house, Gonzalez over time became Burke's primary contact for the Union. Ryerson was still involved but not as much.

[31] The Union additionally presented attorney George Munoz, who testified he began working for the Union on Arriba matters in 2002. He described Ryerson as having actively represented the Union only from 1990 to 1999. He further opined that Ryerson should not have been working to settle the case. The jury was also free to reject Munoz's testimony.

Ryerson stated that Choreno first contacted him about the possibility of negotiating a settlement. Ryerson said that he learned that LaQuina was handling certain issues for the Union because of the evolving scandal involving Pemex and other officials, which saw the Union's top two elected leaders, Deschamps and Aldana, charged with embezzling the very funds discovered in the New York bank account. Ryerson and others described LaQuina as having been very influential within the Union even at times when he held no official title.[32] Ryerson further testified he was told LaQuina had specifically been tasked with resolving the issue of the garnished funds themselves. Ryerson said that he performed "lots of due diligence" in investigating whether LaQuina, Choreno, and Alvarez had the requisite authority to act on behalf of the Union. He met with LaQuina twice in Mexico, met and spoke with Choreno and Alvarez, and "talked to trusted consultants and colleagues." Ryerson emphasized that he verified the information with the office of President Fox, and was specifically told by the president's office that he was to deal with LaQuina and Choreno in handling the Arriba litigation.[33] Ryerson further opined that it made sense not to deal with Deschamps and Aldana, given the charges levied against them, although he later acknowledged that they had not been officially removed from power and were never convicted.

Ryerson testified that he was initially hired for the Union by Choreno, and some early documents filed in the litigation bear Choreno's signature. Ryerson further described Choreno as having been a longtime attorney for the Union.[34] He stated that while Gonzalez had taken over Choreno's duties of oversight on Arriba matters in

32. Ryerson testified that LaQuina "did not have legal authority on behalf of the Union in 1989, yet the Union did whatever he said. It was an issue of power. ... [H]e was the absolute power, yes." Nelson described LaQuina as "an extremely powerful, almost legendary figure in Mexico. [H]is ... endorsement of a presidential candidate had for years before resulted in a successful election campaign." Nelson further explained that even without an official title, LaQuina had been "the center of everything in the case previously" and maintained "considerable influence," and it would have been irresponsible to ignore him.

LaQuina had been the Union's secretary general, among other positions, and in other testimony it was represented that an individual could be secretary general for only two terms, which might explain why LaQuina left the position but retained substantial power. Indeed, Black recounted being summoned to meet with LaQuina at a Union convention in the 1980s when he was no longer secretary general, but Black said he was still "clearly the person in charge."

The picture painted for the jury regarding the inner workings of the Union contained allegations from both sides of corruption, factionalism, and political intrigue. In light of

this background, it would not have been unreasonable for the jury to conclude that LaQuina was still a powerful figure in the Union at the time the Garnished Funds Agreement was entered, and that he might be someone who could step in while the elected leaders were facing criminal investigation and charges.

33. When pressed regarding who he spoke to at the president's office, Ryerson only identified President Fox's son. Although Ryerson acknowledged the son had no official title within the government at the time, Ryerson said that the son was speaking "for the president." Ryerson appeared to believe that the president's opinion carried some weight with the Union. There is certainly no evidence to the contrary. Interestingly, Nelson testified that Mexican entities appeared to shift to suit their purposes: one day, Pemex, the Union, and the government all appeared to be part of the same entity; then, on another day, they appeared to be totally separate.

34. According to Ryerson, Choreno's power of attorney was signed by the Union's Minister of the Interior, whom Ryerson described as having the broadest possible powers within the Union.

1992; Choreno still worked for the Union on other matters and the two had continued sporadic contact through the years. Ryerson testified that when he told LaQuina and Choreno that he needed someone with authority to sign the Garnished Funds Agreement on behalf of the Union, they directed him to Alvarez. Ryerson recalled that he had previously met Alvarez during the early years of the Arriba litigation. Alvarez, too, allegedly had a power of attorney from the Union, and he sent a letter to Ryerson under Union letterhead purporting to "ratify" Ryerson's representation of the Union and the Commission. In the letter Alvarez stated: "[W]e earnestly ask you to please take all necessary measures to bring to a good conclusion the negotiations" with Arriba. To downplay their significance, Gonzalez testified on behalf of the Union that neither Choreno nor Alvarez was a Union member.

Ryerson further testified that extensive negotiations leading up to the Garnished Funds Agreement ensued between him—with Choreno as his primary contact with the Union—and Nelson and Black, representing Arriba. Nelson also testified that, given past history, it was "ridiculous" to suggest Ryerson was not representing the Union at the time of the negotiations. Meetings were had, telephone calls were made, and emails were sent back and forth with proposals. Both sides had to discuss proposals with and get approval from their respective clients. Nelson said that he dealt with Ryerson because "he was the guy," he had the relationship with the Union. Nelson further testified that he also dealt with Choreno and Alvarez regarding the settlement and thinks LaQuina may have been involved as well. Ryerson additionally testified that it made no sense for him to have negotiated the Garnished Funds Agreement if he did not think he

was representing the Union: "There's no purpose to concoct something that isn't going to take place."

The Union attacked Ryerson's testimony by pointing out that he failed to inform Deschamps, Aldana, the Union's executive committee, or the other lawyers representing the Union in the garnishment action about the Garnished Funds Agreement until he filed his motion for intervention in the garnishment action. Indeed, Arriba also was cautioned not to inform these individuals. Ryerson explained that Deschamps and Aldana had been charged with illegally taking the funds and noting that the executive committee was comprised of "Deschamps' people." Ryerson further said, however, that he believed others in the Union were aware of the settlement.

### 4. Conclusion

Arriba and Ryerson presented significant evidence that people with power in the Union authorized the Garnished Funds Agreement. That evidence was not without its weaknesses, particularly the lack of official titles within the Union for the key actors, LaQuina, Choreno, Alvarez, and Ryerson, and the lack of direct proof of any authority the Mexican president's office may have held. However, given the unique and complex picture presented in this case concerning Mexican politics and the Union's internal workings, we cannot say that the jury's verdict was unreasonable or so contrary to the overwhelming weight of the evidence as to be wrong and manifestly unjust. See *City of Keller*, 168 S.W.3d at 822; *Cain*, 709 S.W.2d at 176. Accordingly we overrule the Union's third issue challenging the legal and factual sufficiency of the evidence supporting the actual authority finding.[35]

---

**35.** Because we affirm the trial court's judg-

ment based on the jury's actual authority find-

## D. Consideration

In its fifth issue, the Union contends that the Garnished Funds Agreement was invalid due to a lack of consideration. Generally, a contract must be supported by consideration to be enforceable. *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 659 (Tex.2006). Consideration consists of a benefit to the promisor or a detriment to the promisee. *N. Natural Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex.1998). A written instrument reciting consideration is presumed to be sufficient. *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 335 (Tex.App.—Houston [14th Dist.] 2011, no pet.). Lack of consideration for a contract is an affirmative defense to its enforcement; therefore, the burden of proof is on the party alleging the lack of consideration. *Id.* What constitutes consideration is a question of law for the court. *Hall v. Hubco, Inc.*, 292 S.W.3d 22, 28 (Tex.App.—Houston [14th Dist.] 2006, pet. denied).

The Union insists that under no reasonable interpretation of the Garnished Funds Agreement did it receive any benefit from entering the agreement, nor did Arriba incur any detriment. However, as Arriba notes, at the time the agreement was entered, Arriba had garnished $43 million in Union funds in a New York bank account. Indeed, Arriba was actively pursuing claims that could potentially have resulted in the entirety of the New York funds being awarded to it. Under the Garnished Funds Agreement's terms, the Union was to be entitled to 48 percent of those funds, minus $1 million to Gomez, without having to continue lengthy and expensive litigation. Viewed from the time that the agreement was entered, this provided a clear benefit to the Union. *See generally* Restatement (Second) of Contracts § 74 ("Settlement of Claims"); *In re Estate of Childs*, No. 04–15–00623–CV, 2016 WL 3452624, at *3 (Tex.App.—San Antonio June 22, 2016, no pet.) (mem. op.) (discussing forbearance of suit as consideration for settlement agreement).

The Union additionally notes that the agreement reinstated the 1986 default judgment, which entitled Arriba to recover even more than the garnished $43 million. While that is true, it did not prevent the immediate return of the 48 percent (minus $1 million), and the agreement potentially restricted Arriba's ability to recover on the 1986 Judgment to "outside of Mexico." Moreover, David Black, as well as other witnesses, testified regarding how difficult it was to locate Union assets outside of Mexico. Thus, the reinstatement of the 1986 Judgment did not deprive the settlement agreement of consideration.[36] Because the Union failed to meet its burden and overcome the presumption that the settlement agreement provided adequate consideration, we overrule the its fifth issue.

### E. Application of Mexican Law

In issue six, the Union contends that the trial court erred in determining

ing, we need not address the Union's fourth issue, challenging the legal and factual sufficiency of the evidence to support the jury's apparent authority finding, or the Union's seventh issue, complaining of the jury instructions on apparent authority. Accordingly, these issues are overruled as moot.

36. At heart, the Union seems to be complaining that the settlement agreement was a "bad deal" for the Union, but the requirement of consideration is not a safeguard against improvident contracts and courts do not ordinarily inquire into the adequacy of consideration. *Sudan v. Sudan*, 145 S.W.3d 280, 286 (Tex.App.—Houston [14th Dist.] 2004) (citing Restatement (Second) of Contracts § 79 cmts. b and c), *rev'd on other grounds*, 199 S.W.3d 291 (Tex.2006).

"that Texas law alone applied to the issue of actual authority and by excluding the Union's evidence of the proper interpretation of [Choreno's and Alvarez's purported] powers of attorney under Mexican law." In its briefing and during oral argument, the Union more specifically complains that the trial court should have (1) held a hearing and determined that Mexican law applied to the powers of attorney, or (2) in the alternative, permitted the Union to present testimony and evidence to the jury regarding the interpretation of the powers of attorney under Mexican law.[37]

■ As discussed regarding the Union's first issue, *supra*, the procedures for proving and determining the law of foreign countries are set forth in Texas Rule of Evidence 203. Tex. R. Evid. 203. A party relying on foreign law must strictly plead and prove the law. *Nguyen v. Nguyen*, 355 S.W.3d 82, 89 (Tex.App.—Houston [1st Dist.] 2011, pet. denied). Although the presentation of foreign law to the court resembles the presentment of evidence, the issue is decided as a question of law. *Long Distance Int'l, Inc. v. Telefonos de Mexico, S.A. de C.V.*, 49 S.W.3d 347, 351 (Tex.2001). The issue of whether Texas or foreign law applies to a particular controversy is also a question of law that we

review de novo. *See Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex. 1984). Texas courts typically resolve such disputes under the principles enunciated in the Restatement (Second) of Conflict of Laws. *See Minn. Mining and Mfg. Co. v. Nishika Ltd.*, 955 S.W.2d 853, 856 (Tex. 1996).

The Union urged the application of Mexican law to the authority issue in a motion to apply Mexican law, two motions to reconsider the denial of that motion, assorted other responses and letters to the court, and two hearings.[38] Arriba and Ryerson argued that Texas law should apply to the authority issue based on the choice-of-law clause contained in the Garnished Funds Agreement or, alternatively, on the "most significant relationship" test found in section 6 of the Restatement. Restatement (Second) of Conflict of Laws § 6 (1971). The Union, Arriba, and Ryerson each designated experts on Mexican law, who apparently disagreed regarding the validity of Choreno's and Alvarez's alleged powers of attorney.[39] In its original motion and at a subsequent hearing, the Union urged the trial court to hold an evidentiary hearing for the purpose of determining which of the experts' opinions regarding Mexican law was correct. While the trial court did not admit evidence dur-

---

**37.** The Union's focus on appeal has shifted from its focus in the trial court. Although the Union certainly requested an evidentiary hearing in the court below and argued that the powers of attorney were of Mexican origin, it specifically sought a determination that Mexican law controlled the question of whether Alvarez and Ryerson had authority to sign the Garnished Funds Agreement and the Ryerson Agreement. On appeal, the Union appears to only be insisting that Mexican law should have applied to the validity of the alleged powers of attorney and not to the ultimate issue of authority to sign the two agreements. It is not clear from the record that the Union ever framed the issue for the trial judge in the limited manner it now does

on appeal. In their trial court filings on the issue, Arriba and Ryerson appear to have interpreted the Union's argument as seeking, at least in part, to have the jury instructed regarding Mexican law on authority. A party's argument on appeal must comport with its complaint in the trial court. *E.g., Garcia v. Alvarez*, 367 S.W.3d 784, 788 (Tex.App.—Houston [14th Dist.] 2012, no pet.).

**38.** All told, the parties filed over 20 documents with the trial court on this issue.

**39.** Specifically, the Union's expert seems to have opined that Mexican law does not recognize a general power of attorney.

ing the two hearings on the issue, it considered the motions, to which evidence was attached, before denying all of the Union's motions. During trial, several objections were sustained when questions were asked pertaining to the specifics of Mexican law, but some statements referencing Mexican law were admitted without objection. At the charge conference at the conclusion of the trial, both sides submitted jury instructions on authority based on Texas law. The Union then presented an offer of proof consisting of testimony from two purported experts on Mexican law, who opined that the powers of attorney were not valid.[40]

■ We turn first to the Union's contention that the trial court should have held an evidentiary hearing on the foreign law issue.[41] The Union neither cites authority nor offers explicit argument in support of its contention that the trial court erred in not holding such a hearing. *See* Tex. R. App. P. 38.1(i) (providing an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").[42] Rule 203 itself contains no reference to a hearing, much less mandates one be held. Moreover, we have consistently stated, in interpreting Rule 203, that a trial court may consider any material or source, whether or not submitted by a party or admissible under the rules of evidence, including affidavits, testimony, briefs, and treatises. *See, e.g., Cal Dive Offshore Contractors Inc. v. Bryant*, 478 S.W.3d 914, 921 (Tex.App.—Houston [14th Dist.] 2015, no pet.) (citing *PennWell Corp, v. Ken Assoc., Inc.*, 123 S.W.3d 756, 760 (Tex.App.—Houston [14th Dist.] 2003, pet. denied)). In other words, the foreign law determination can be addressed with or without an evidentiary hearing. Accordingly, the trial court did not err in failing to hold an evidentiary hearing on the Union's motion.

■ Next, we consider the Union's contention that the trial court should have permitted it to present evidence to the jury regarding the interpretation of the powers of attorney under Mexican law. We begin by noting that it is not clear on what basis the Union contends that it should have been permitted to introduce this testimony.[43] Texas law is clear that the determination of foreign law is a matter for the court, not the jury. *See Long Distance Int'l*, 49 S.W.3d at 351. The Union complains that appellees' witnesses mentioned Mexican law a few times, but its remedy would have been to object to those refer-

---

**40.** Arriba strenuously objected to the offer on several grounds, including that one of the offer-of-proof experts had not been designated as an expert witness. The Union did not dispute that assertion.

**41.** In a hearing on July 11, 2013, reference was made to an earlier hearing on the motion to have Mexican law apply, but it is not stated whether any evidence was presented at the earlier hearing. The record on appeal does not contain a transcript of the earlier hearing. The trial court also held a hearing on the Union's motions to reconsider the application of Mexican law, but no evidence was offered or received during that hearing other than what was attached to the motions.

**42.** In the trial court, counsel for the Union referenced our opinion in *Ahumada v. Dow Chemical Co.*, 992 S.W.2d 555 (Tex.App.—Houston [14th Dist.] 1999, pet. denied), as authority that an evidentiary hearing is required; however, that opinion did not so hold. In fact, we affirmed a grant of summary judgment in *Ahumada* in which the foreign law was presented in affidavits and attachments to affidavits and not at an evidentiary hearing. *Id.* at 558–59.

**43.** When asked directly during oral argument for legal authority supporting its position that the experts should have been allowed to testify before the jury, the Union's counsel did not provide any such authority.

ences and, if the objections were overruled, bring forward an issue on appeal.[44] The Union offers no support for the position that, since appellees' witnesses made unobjected-to statements regarding Mexican law, the Union should have been permitted to have its experts testify on the topic.

The Union may be suggesting that it should have been permitted to offer its expert testimony to the jury on a mixed question of law and fact. *See GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 619–20 (Tex. 1999); *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 94 (Tex.App.—Houston [14th Dist.] 2004, no pet.). The Union, however, does not make this argument explicitly, and does not argue any other theory by which the terms of the contract would be interpreted by the jury.[45]

■ Moreover, in order to support reversal of the trial court's judgment, it is not enough for the Union to merely argue that the trial court should have assessed the powers of attorney under Mexican law; it needed to have established that the trial court's failure to apply Mexican law probably caused the rendition of an improper judgment or probably prevented the Union from properly presenting its case on appeal. *See* Tex. R. App. P. 44.1(a) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the ... error

complained of: (1) probably caused the rendition of an improper judgment; or (2) probably prevented the appellant from properly presenting the case to the court of appeals."); *Ford Motor Co. v. Castillo*, 279 S.W.3d 656, 667 (Tex.2009) (holding it is the complaining party's burden to show harm on appeal); *see also Guniganti v. C & S Components Co.*, 467 S.W.3d 661, 665–66 (Tex.App.—Houston [14th Dist.] 2015, no pet.) (overruling appellate issue because complaining party failed to demonstrate harm). The Union offers no analysis on appeal, and offered no argument below, regarding why its experts' reading of Mexican law should be preferred over that of Ryerson and Arriba's experts. Additionally, as discussed above in the section of the opinion on actual authority, despite the Union's insistence to the contrary, the authority issue did not turn wholly on the validity of the powers of attorney but also involved an assessment of other evidence.

The Union has failed to establish that the trial court erred in failing to have an evidentiary hearing regarding Mexican law or in refusing to permit the Union's legal experts to testify before the jury, and it has failed to demonstrate harm in the event the court did err. Accordingly, we overrule the Union's sixth issue.

### F. Timely Disclosure of Evidence

In its eighth and ninth issues, the Union asserts that the trial court erred in deny-

---

44. The trial court sustained several objections to statements referencing Mexican law.

45. In order to present expert testimony on a mixed question of law and fact to the jury, the Union needed to have established that the issue was properly one for the jury and that its experts were correct on the law. The Union has offered no analysis—here or in the trial court—that its experts's opinions on Mexican law were "fixed by law." *See Bruce*, 998 S.W.2d at 619–20; *Greenberg Traurig*, 161 S.W.3d at 94–95 ("It is not the role of the

expert witness to define the particular legal principles applicable to a case; that is the role of the trial court."). Furthermore, the Union has not asserted that the powers of attorney were ambiguous such that their interpretation would be a matter for the jury and not the judge. *See, e.g., Coker v. Coker*, 650 S.W.2d 391, 393–94 (Tex.1983) (explaining that when a written instrument contains an ambiguity, the interpretation of the instrument becomes a fact issue).

ing the Union's two motions for mistrial based on Arriba and Ryerson's allegedly untimely disclosure of certain pieces of evidence. Specifically, the Union contends that Arriba failed to disclose information pertaining to the verification of Alvarez's identity prior to execution of the Garnished Funds Agreement and Ryerson failed to disclose an affidavit apparently supporting his version of events occurring at a Mexican bank.

■■■ We review a trial court's denial of a motion for mistrial under an abuse of discretion standard. *E.g., Schlafly v. Schlafly*, 33 S.W.3d 863, 868 (Tex.App.—Houston [14th Dist.] 2000, pet. denied). A trial court abuses its discretion if it acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985). With certain exceptions not alleged here, under Texas Rule of Civil Procedure 193.6, "[a] party who fails to make, amend, or supplement a discovery response in a timely manner may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified." Tex. R. Civ. P. 193.6. The purpose of the rule is to prevent trial by ambush. *Reservoir Sys., Inc. v. TGS–NOPEC Geophysical Co.*, 335 S.W.3d 297, 311 (Tex.App.—Houston [14th Dist.] 2010, pet. denied).

## 1. Alvarez's Identity

The Union's first motion for mistrial concerned testimony surrounding Arriba's attempts to verify Alvarez's identity prior to execution of the Garnished Funds Agreement. During the Union's questioning of Arriba receiver Gomez, he suggested that his attorney in the Bahamas, Ruth Bowe-Darville, performed some degree of due diligence to make sure Alvarez was who he claimed to be prior to execution of the agreement. Although Gomez did not recall the specifics of how this was done, he stated that he might review a passport or power of attorney for identification purposes.[46]

The Union suggests Gomez's testimony was grounds for a mistrial because Arriba failed to acknowledge Bowe-Darville's role in its discovery responses or produce the documents she used to verify Alvarez's identity.[47] In support, the Union cites Rule 193.6 and our sister court's opinion in *Lopez v. La Madeleine of Texas, Inc.*, 200 S.W.3d 854 (Tex.App.—Dallas 2006, no pet.). As set forth above, Rule 193.6 prohibits a party from introducing evidence that was not timely disclosed in discovery responses. In *Lopez*, a defendant in a personal injury case used an undisclosed surveillance video to impeach the plaintiff's testimony regarding the extent of his injuries. *Id.* at 856. Here, however, it was the Union that elicited Gomez's testimony, not Arriba. *Cf. In re City of Houston*, 418

---

**46.** The Union frames the issue as Bowe-Darville having verified Alvarez's *authority* to act on behalf of the Union. The record is not quite that clear regarding what Bowe-Darville did. Gomez appeared to be speaking generally regarding what documents are presented to him before he signs agreements. During his testimony, Nelson was also asked briefly about Bowe-Darville's role. He rejected the idea that she performed due diligence to verify authority, saying instead that she merely "made sure they [Alvarez and Ryerson] were who they said they were when they arrived."

Whereas Gomez spoke ambiguously on the matter, Nelson's testimony was direct.

**47.** It is worth noting that evidence concerning both documents Gomez mentioned as possible proof of identity—Alvarez's passport and power of attorney—were made available to the Union in this case. Alvarez's passport number appears listed on defendant's exhibit 50-B, which was the document evidencing Alvarez's power of attorney attached to the Garnished Funds Agreement.

S.W.3d 388, 396 (Tex.App.—Houston [1st Dist.] 2013, orig. proceeding) (holding trial court abused its discretion in granting new trial where prevailing party did not seek to use undisclosed evidence at trial).[48] Neither Rule 193.6 nor *Lopez* has obvious application to this situation.

 Furthermore, the Union failed to timely object to Gomez's testimony regarding Bowe-Darville's actions or request that the jury be instructed to disregard his answers at the time it elicited the testimony. *See* Tex. R. App. P. 33.1(a) (requiring timely request, objection, or motion to preserve complaint for appellate review); *Kheir v. Progressive Cty. Mut. Ins. Co.*, No. 14–04–00694–CV, 2006 WL 1594031, at *8 (Tex.App.—Houston [14th Dist.] June 13, 2006, pet. denied) (mem. op.) (holding party complaining of admission of evidence that was not produced in response to discovery requests waived error by not timely objecting based on Rule 193.6). The Union elicited the testimony from Gomez on February 6, 2014. It filed a written motion for mistrial and brought the issue to the attention of the judge on February 12 and again on February 14. To be considered on appeal, an objection to the admission of evidence must be made when the evidence is offered, not well after it was introduced. *See Caterpillar Tractor Co. v. Boyett*, 674

S.W.2d 782, 793 (Tex.App.—Corpus Christi 1984, no writ) (holding complaint regarding improper evidence was waived where, at the time of testimony, no objection, request for an instruction, or motion was made but a motion for mistrial was filed four days later). We overrule the Union's eighth issue.[49]

### 2. Incident at Mexican Bank

The Union's second motion for mistrial was based on Ryerson's attorney's questioning of one of the Union's lawyers, Gonzalez, about an incident that occurred at a Mexico City bank. According to Ryerson's own testimony, he expected to receive that day a $3.5 million cash payment for services, but the Union's secretary general, Deschamps, took $2.5 million of the cash, leaving Ryerson with only $1 million. In his testimony, Gonzalez denied several aspects of Ryerson's story, including that Gonzalez had told Ryerson he could "either take a million dollars or nothing." Ryerson's attorney then asked Gonzalez: "If Mr. [Juan] Contalba gave an affidavit saying that Mr. Ryerson only received a million dollars, would you have any reason to refute that?"[50] When Gonzalez stated he did not understand the question, Ryerson's attorney requested permission from the judge to approach and show Gonzalez a

48. In rejecting the application of *In re Houston* to this case, the Union notes that Arriba's attorney mentioned Alvarez's passport in closing argument. As noted, however, Alvarez's passport number appeared on exhibit 50-B, which was properly disclosed. Moreover, the Union cites no authority suggesting reversible error occurred when Arriba's counsel mentioned testimony elicited by the Union.

49. The Union further complains that the trial court prevented its attorney from confronting Gomez with the fact that Bowe-Darville's documents had not been produced; however, all the trial court did when Gomez was asked about document production was sustain an objection that the line of questioning violated

the motion in limine. The Union's attorney did not then ask to discuss the matter outside the jury's presence or otherwise pursue the matter. *See generally In re R.F.*, No. 09–10–00220–CV, 2011 WL 1204005, at *2 (Tex. App.—Beaumont March 31, 2011, no pet.) (mem. op.) ("The purpose of a motion in limine is to require an offering party to approach the bench and inquire into the admissibility of the evidence prior to introducing the evidence to the fact finder.").

50. Contalba apparently worked as a legal assistant for Ryerson and was deceased by the time of trial.

document. At this point, the Union's attorney objected on hearsay grounds, the trial court sustained the objection, and the testimony continued without any further reference to an affidavit by Contalba. Later that day, the Union filed a supplemental motion for mistrial based on the fact that the affidavit was not produced in response to discovery before trial. The Union further requested, in the alternative, that the jury be instructed to disregard any evidence related to Contalba. The trial court denied the motion.

■ The only authority the Union cites under this issue is the *Lopez* case discussed above, which relies on Rule 193.6, also discussed above. *See* Tex. R. Civ. P. 193.6; *Lopez*, 200 S.W.3d 854. As mentioned, Rule 193.6 operates to prevent a party from introducing evidence that was not timely disclosed in the party's discovery responses. In *Lopez*, the rule was applied where a party attempted to introduce impeachment evidence that had not been timely disclosed. 200 S.W.3d at 856. In the present case, however, Ryerson never actually sought to introduce the Contalba affidavit; he merely attempted to show a document to the witness. At that point, the Union objected, the trial court sustained the objection, and the trial moved forward without any document being offered into evidence or any further reference being made to an affidavit by Contalba.[51] The Union fails to explain how Rule 193.6 or *Lopez* necessitates a mistrial under these circumstances.

Furthermore, at the time the affidavit was mentioned, the Union received the exact relief it requested, *i.e.*, its hearsay objection was sustained and the affidavit was not mentioned again. The Union did not raise a timely objection based on Rule 193.6 or timely request an instruction to

the jury or a mistrial. *See* Tex. R. App. P. 33.1(a) (requiring timely request, objection, or motion to preserve complaint for appellate review); *State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n. 6 (Tex.1989) ("Failure to request the court to instruct the jury to disregard the inadmissible testimony results in waiver of the alleged error where the instruction would have cured the error."); *Cal Dive Offshore*, 478 S.W.3d at 929 (affirming denial of motion for mistrial where error in admitting evidence could have been cured by instruction to disregard but no such instruction was requested); *Moran v. Mem'l Point Prop. Owners Ass'n*, 410 S.W.3d 397, 407 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding complaints on appeal must comport with objections raised in trial court to preserve error); *Kheir*, 2006 WL 1594031, at *8 (holding party waived error by not timely objecting based on Rule 193.6). Accordingly, we overrule the Union's ninth issue.

### G. Counterclaims

■ Lastly, in issue ten, the Union contends the trial court erred in declining to submit jury questions regarding the Union's claim for wrongful garnishment damages against Arriba and Ryerson and claims of breach of fiduciary duty against Ryerson. A party is entitled to a jury question on a properly pleaded cause of action if there is some evidence to support its submission. *See* Tex. R. Civ. P. 278; *Hiles v. Arnie & Co., P.C.*, 402 S.W.3d 820, 830 (Tex.App.—Houston [14th Dist.] 2013, pet. denied).

#### 1. Wrongful Garnishment

■ The Union claims that the trial court found the writs of garnishment to be

---

**51.** The Union filed a written motion for mistrial and asked for relief at the end of the trial day, after Arriba rested and the jury was excused.

wrongful as a matter of law in dissolving them, but erroneously refused to submit an issue on its damages to the jury. A garnishment is generally considered to be wrongful when false statements of fact are made in the affidavit prescribed by Civil Practice and Remedies Code section 63.001.[52] *See Cadle Co. v. Davis,* No. 04–09–00763–CV, 2010 WL 5545389, at *7 n. 4 (Tex.App.—San Antonio Dec. 29, 2010, pet. denied) (mem. op.); *Jamison v. Nat'l Loan Inv'rs, L.P.,* 4 S.W.3d 465, 468 (Tex.App.—Houston [1st Dist.] 1999, pet. denied). The trial court made no explicit finding in its orders that the garnishments were wrongful. The Union does not cite any authority or make any argument supporting the notion that an order dissolving a garnishment establishes wrongful garnishment as a matter of law. The order may be some evidence of wrongful garnishment, but it is not conclusive evidence. *Cf. Cadle Co.,* 2010 WL 5545389, at *7 (holding dissolution of writ of garnishment in prior action did not operate as collateral estoppel in subsequent wrongful garnishment lawsuit).

In its reply brief, the Union argues that Arriba's garnishment was wrongful because it "ultimately hinged on the validity of the 'contractual reinstatement' of the 1986 Default Judgment." The Union, however, does not cite any evidence establishing as a matter of law that the reinstatement was invalid; moreover, that issue is apparently still in dispute in the pending litigation between the parties concerning the 1989 default judgment. In order to be entitled to a jury question on damages, the Union must first prevail on its wrongful garnishment action by motion for summary judgment or trial on the merits. The motion to dissolve was neither. *See id.* The Union has failed to demonstrate its entitlement to a jury charge question on the issue of wrongful garnishment damages.

## 2. Breach of Fiduciary Duty

The Union asserts that Ryerson used his position as the Union's attorney to negotiate two contracts that benefitted Ryerson to the Union's detriment and, therefore, breached his fiduciary duty to it. The elements of a breach-of-fiduciary-duty claim against an attorney are (1) the existence of a fiduciary relationship, (2) a breach of a fiduciary duty by the attorney defendant, and (3) resulting damages to the plaintiff. *Frankoff v. Norman,* 448 S.W.3d 75, 85 (Tex.App.—Houston [14th Dist.] 2014, no pet.). An attorney owes fiduciary duties to a client as a matter of law. *Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988). The Union begins its brief argument by asserting that Ryerson was not the Union's attorney at the time he negotiated the Garnished Funds Agreement and the Ryerson Agreement.[53] This argument negates the first element of breach of fiduciary duty. Moreover, the Union offers no explanation and cites no

---

**52.** Section 63.001 provides that:
A writ of garnishment is available if:
 (1) an original attachment has been issued;
 (2) a plaintiff sues for a debt and makes an affidavit stating that:
 (A) the debt is just, due, and unpaid;
 (B) within the plaintiff's knowledge, the defendant does not possess property in Texas subject to execution sufficient to satisfy the debt; and
 (C) the garnishment is not sought to injure the defendant or the garnishee; or

(3) a plaintiff has a valid, subsisting judgment and makes an affidavit stating that, within the plaintiff's knowledge, the defendant does not possess property in Texas subject to execution sufficient to satisfy the judgment.
Tex. Civ. Prac. & Rem. Code § 63.001.

**53.** The Union cites no other formal or informal relationship between it and Ryerson that would give rise to a fiduciary duty.

evidence concerning its assertion Ryerson negotiated these agreements *to the Union's detriment*. As discussed above, we have concluded the Garnished Funds Agreement provided consideration flowing to the Union. The Union further offers no argument or analysis that the fees provided for in the Ryerson Agreement were unfair or unreasonable. The record is replete with evidence concerning Ryerson's purported services for the Union prior to execution of the agreement. *See generally McGuire, Craddock, Strother & Hale, P.C. v. Transcon. Realty Inv'rs, Inc.*, 251 S.W.3d 890, 895 (Tex.App.—Dallas 2008, pet. denied) ("Whether a fee agreement is fair and reasonable is judged at the time the parties enter into the agreement."). Accordingly, the Union has failed to establish its entitlement to a jury question on breach of fiduciary duty. *See* Tex. R. Civ. P. 278; *Hiles*, 402 S.W.3d at 830. We overrule the Union's tenth issue.

### III. Cross-Appeals

In their cross-appeals, Arriba and Ryerson contend the trial court erred in refusing to award them any monetary damages based on the Union's breach of, respectively, the Garnished Funds Agreement and the Ryerson Agreement. The breach of contract claims were submitted to the judge after the jury decided the question of authority to enter the agreements, among other issues. In its judgment, the trial court concluded that Arriba and Ryerson were not entitled to monetary damages but Arriba was entitled to specific performance concerning the Garnished Funds Agreement's provisions regarding enforceability of the 1986 default judgment.

### A. Standards of Review

 To prevail on a breach of contract claim, a party must establish the following elements: (1) a valid contract ex-

isted between the plaintiff and the defendant, (2) the plaintiff tendered performance or was excused from doing so, (3) the defendant breached the terms of the contract, and (4) the plaintiff sustained damages as a result of the defendant's breach. *West v. Triple B Servs., LLP*, 264 S.W.3d 440, 446 (Tex.App.—Houston [14th Dist.] 2008, no pet.). A breach occurs when a party fails or refuses to do something it has promised to do. *Id.* The evidence must show that the damages are the natural, probable, and foreseeable consequence of the defendant's conduct. *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). The absence of a causal connection between the alleged breach and the alleged damages precludes recovery. *Gotch v. Gotch*, 416 S.W.3d 633, 638 (Tex.App.—Houston [14th Dist.] 2013, no pet.).

 The construction of an unambiguous written contract is a question of law for the court. *See Matagorda Cty. Hosp. Dist. v. Burwell*, 189 S.W.3d 738, 740 (Tex.2006). When construing a contract, we must ascertain the true intentions of the parties as expressed in the writing itself. *See Ital. Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 333–34 (Tex.2011). In identifying the intention of the parties, we examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 662 (Tex.2005). Contract terms are given their plain, ordinary, and generally accepted meanings unless the contract itself shows them to be used in a technical or different sense. *Id.*

When reviewing for legal sufficiency, we consider the evidence in the light most favorable to the finding and indulge every reasonable inference that supports the challenged finding. *City of Keller v. Wil-*

*son*, 168 S.W.3d 802, 822 (Tex.2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* at 827. If there is more than a scintilla of evidence to support the finding, the legal-sufficiency challenge fails. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 795 (Tex.2002).[54]

### A. Garnished Funds Agreement

Arriba begins by asserting that the trial court misconstrued the Garnished Funds Agreement as only requiring distribution of the garnished funds if they were released pursuant to the writs of garnishment. In its "Opinion and Order," issued the same day as the judgment, the trial court indeed stated, "The Garnished Funds Agreement provided terms for dividing the garnished funds *if they were released pursuant to the writs of garnishment*" (emphasis added). The court went on to conclude:

> [t]he writs of garnishment were dissolved by this Court and the funds were not subject to the distribution provisions stated in the Garnished Funds Agreement. Therefore, based on the language of the Garnished Funds Agreement, the Court finds that there was no breach of contract based on the garnished funds.

The trial court further emphasized that the Garnished Funds Agreement contained specific consequences depending on whether the funds were or were not distributed pursuant to the terms of the agreement. For example, under article IV of the

agreement, if the funds were not so distributed, Arriba could enforce the judgment "in any legal manner, anywhere in the world, except in the country of Mexico," but if the funds were so distributed, the judgment then "could be enforced anywhere without restriction."

Arriba argues that the trial court's emphasis on the consequences for nondistribution was misplaced. According to Arriba, the fact that the agreement contained certain consequences did not otherwise excuse the Union from its obligation to pay Arriba 52 percent plus $1 million of the garnished funds. Arriba instead stresses that article III of the Garnished Funds Agreement provides that "the funds ... *shall* be distributed" (emphasis added). Arriba insists that the Union's failure to distribute or pay funds to Arriba constituted a breach of the agreement.

■■■ We begin our analysis by noting that the Garnished Funds Agreement clearly considered distribution of particular funds and not a general or unconditional payment obligation by the Union to Arriba; there is no other reasonable way to read the agreement's identification of the funds and distribution of percentages rather than specific amounts.[55] *See, e.g., Walston v. Anglo–Dutch Petroleum (Tenge) L.L.C.*, No. 14–07–00959–CV, 2009 WL 2176320, at \*3–5 (Tex.App.—Houston [14th Dist.] July 23, 2009, no pet.) (mem. op.) (holding agreement granted interest in a

**54.** Arriba does not expressly challenge the legal sufficiency of the evidence to support the judgment; it merely asserts the trial court erroneously interpreted the Garnished Funds Agreement. As will be discussed in detail below, even if Arriba's interpretation of the agreement is correct, that does not mean it is entitled to damages absent proof of breach, causation, and injury. *See generally West*, 264 S.W.3d at 446 (breach of contract elements). We therefore provide the general standards

for legal sufficiency review. Arriba does not make any arguments or request any relief associated with factual insufficiency.

**55.** In describing what was to be distributed pursuant to its terms, the Garnished Funds Agreement expressly references funds attached to a specific bank account number and under the writs of garnishment.

particular fund and thus plaintiffs were not entitled to proceeds from settlement of lawsuit that were not part of the fund); *Clear Lake City Water Auth. v. Kirby Lake Dev., Ltd.*, 123 S.W.3d 735, 745 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding agreement unambiguously limited water authority's obligation to pay to receipt of voter-approved bond funds); *McWilliams v. Gilbert*, 715 S.W.2d 761, 763–64 (Tex.App.—Houston [1st Dist.] 1986, no writ) (holding indemnity agreement unambiguously restricted general partners' reimbursement from partner to designated specific source); *City of Seymour v. Mun. Acceptance Corp.*, 96 S.W.2d 814, 816–17 (Tex.Civ.App.—Dallas 1936, writ dism'd by agreement) (holding contract with city limited source of payment to net revenues of light plant). Arriba appears to accept this basic understanding; although at times it refers to "a payment of money" to it from the Union, the payment implied seems to be that of the garnished funds.[56] The Garnished Funds Agreement further recognized that there were other potential claims on the funds that could prevent their distribution to the Union and Arriba. At the end of article III, the agreement states: "The parties also agree to use their best efforts to resolve any outstanding claims affecting the Garnished Funds that have been made, or which may be made, in the action pending in the United States District Court, Eastern District of New York . . . ."

The difficulty with Arriba's position is that even if its interpretation of the agreement is correct, *i.e.*, that the Union promised to pay Arriba 52 percent plus $1 million of the funds in the New York bank account regardless of whether they were distributed according to the writs of garnishment, Arriba still has to demonstrate breach and an injury resulting from that breach in order to be entitled to monetary damages. *See West*, 264 S.W.3d at 446; *Gotch*, 416 S.W.3d at 638; *see also* Tex. R. App. P. 44.1 (harmless error rule). The mere failure to distribute funds to Arriba could not be a breach of the agreement if the Union never gained access to the specific funds that were to be distributed. *See Walston*, 2009 WL 2176320, at *3–5; *Clear Lake City Water Auth.*, 123 S.W.3d at 745; *McWilliams*, 715 S.W.2d at 763–64; *City of Seymour*, 96 S.W.2d at 816–17. Apparently recognizing this, Arriba additionally argues that the Union breached the Garnished Funds Agreement not only in failing to distribute the funds according to the agreement's terms but also in actively working to prevent such distribution.[57] Arriba contends the Union did this by failing to perform two additional obligations in the agreement: (1) take the steps necessary to "assure prompt presentation" of an agreed order to the judge to effectuate the distribution and (2) use "best efforts to resolve any outstanding claims" that affect the funds.

While it is true that the Union did not promptly present an agreed order to the

---

**56.** In its live pleading, Arriba alleged that in the Garnished Funds Agreement, the Union agreed that 52 percent "of the account" was to go to Arriba and did not allege any general obligation for the Union to pay Arriba money.

**57.** Arriba cites *City of Seymour*:

A contract or promise to pay may be restricted to a particular fund, so as to make the raising or the sufficiency of the fund a condition precedent to the liability, and in

such case the promise cannot be enforced until the fund is realized, *unless the failure to realize or collect the fund from which payment is made is due to the neglect, or to the unreasonable refusal to act, of the promisor, or is otherwise attributable to him.*

96 S.W.2d at 816 (quoting 13 C.J. Contracts § 701 (1971)) (emphasis added in Arriba's brief).

trial judge, neither did Arriba.[58] In fact, Nelson, Arriba's attorney at the time, testified that the parties discussed delaying filing the order due to the "political upheaval" in Mexico surrounding the evolving Pemexgate scandal. Gomez also testified that it was Nelson's decision not to file the order promptly with the trial court. The evidence therefore does not support the conclusion that the Union breached that part of the agreement thereby causing injury to Arriba.

As to using best efforts to resolve outstanding claims, the Union maintains that having the funds—and hence the issues concerning ownership of the funds—sent back to Mexico to be decided by a Mexican court was a reasonable effort to resolve other outstanding claims. This was the result sought by the Mexican government and the United States government on behalf of the Mexican government and permitted by the federal district court. Arriba does not cite to any evidence suggesting that return of the funds to Mexico was not a reasonable effort to resolve the outstanding claims. Arriba has therefore failed to establish breach, causation, or injury based on the parties' "best efforts" obligation.[59]

Because Arriba has not established any basis for it to be awarded actual damages,

the trial court did not err in declining to do so. Accordingly, we overrule Arriba's sole issue.

### B. Ryerson Agreement

The one page Ryerson Agreement provides in relevant part that "[w]ith respect to the recovery of the [garnished funds], we have agreed ... that Carlos A. Ryerson, Esq., shall receive, of the 48% that are apportioned or belong to [the Union,] the amount of US $7,000,000.00 as legal fees ...." In his appellate briefing, Ryerson acknowledges the obvious, that the Ryerson Agreement looked solely to particular funds for payment of his legal fees and did not create a general or unconditional obligation to pay those fees. In short, if the particular funds, *i.e.*, the Union's 48 percent share of the funds subject to the Garnished Funds Agreement, were unavailable, then the Ryerson Agreement placed no obligation on the Union to pay Ryerson's legal fees. *See Walston*, 2009 WL 2176320, at *3–5; *Clear Lake City Water Auth.*, 123 S.W.3d at 745; *McWilliams*, 715 S.W.2d at 763–64; *City of Seymour*, 96 S.W.2d at 816–17. As discussed above regarding Arriba's appeal, the garnished funds were not established to be available for distribution, either to Arriba and the Union or, by extension, to Ryer-

---

**58.** The agreement provided that "... the parties further agree to take whatever steps necessary to assure prompt presentation of this Agreed Order to the [trial] judge. ..."

**59.** We further note that Arriba does not point to any evidence establishing that the garnished funds rightfully belonged to the Union. Union attorney Munoz testified that the Mexican government claimed that the garnished funds belonged to Pemex (the state-owned petroleum company) and had been misappropriated. Indeed, this appears to be the basis for the original restraining order on the funds obtained by the United States government on behalf of the Mexican government. If the funds belonged to Pemex (or otherwise to the

Mexican government) and not the Union, then article III of the Garnished Funds Agreement amounted to no more than an agreement to divide a third-party's money—a possibility recognized within article III itself when it mentioned other possible claims to the funds. Clearly, if the money rightfully belongs to a third party, then neither Arriba nor the Union would be entitled to a percentage of the money regardless of any alleged breach of the agreement. Phrased alternatively, if the funds belonged to a third-party, Arriba presents no basis for recovery from the Union. The record before us appears to reveal nothing about what happened to the money after it was released to the Mexican government.

son. Ryerson additionally raises some of the same arguments as Arriba discussed above, alleging the Union actively worked to frustrate distribution of the garnished funds. For the reasons stated above, we reject these arguments. Because Ryerson has not established any basis for an award of actual damages, we overrule his sole issue.[60]

Having overruled all issues bought by the parties in these three appeals, we affirm the trial court's judgment.

**60.** As with Arriba, Ryerson does not raise any arguments or request any relief that would necessitate a remand to the trial court.